**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| MICHAEL L. FERGUSON, | : | CIVIL ACTION NO. |
| MYRL C. JEFFCOAT and | : | |
| DEBORAH SMITH, on behalf of the | : | CASE NO._____ |
| DST SYSTEMS, INC. 401(K) PROFIT | : | |
| SHARING PLAN, | : | |
| | : | COMPLAINT |
| Plaintiffs, | : | |
| | : | JURY TRIAL DEMANDED |
| v. | : | |
| | : | |
| RUANE CUNIFF & GOLDFARB INC.; | : | |
| DST SYSTEMS, INC.; THE ADVISORY | : | |
| COMMITTEE OF THE DST SYSTEMS, INC. | : | |
| 401(K) PROFIT SHARING PLAN; THE | : | |
| COMPENSATION COMMITTEE OF THE | : | |
| BOARD OF DIRECTORS OF DST SYSTEMS, | : | |
| INC.; GEORGE L. ARGYROS; TIM BAHR; | : | |
| JEROME H. BAILEY; LYNN DORSEY BLEIL; | : | |
| LOWELL L. BRYAN; NED BURKE; JOHN W. | : | |
| CLARK; MICHAEL G. FITT; GARY D. | : | |
| FORSEE; STEVEN GEBBEN, GREGG WM. | : | |
| GIVENS; KENNETH HAGER; CHARLES E. | : | |
| HALDEMAN, JR.; LAWRENCE M. HIGBY; | : | |
| JOAN HORAN; STEPHEN HOOLEY; | : | |
| ROBERT T. JACKSON; GERARD M. LAVIN; | : | |
| BRENT L. LAW; SAMUEL G. LISS; | : | |
| THOMAS MCDONNELL; JUDE C.METCALFE; | : | |
| TRAVIS E. REED; M. JEANNINE | : | |
| STRANDJORD; BETH SWEETMAN; | : | |
| DOUGLAS TAPP and RANDALL YOUNG, | : | |
| | | |
| Defendants. | | |

## I.   **INTRODUCTION**

1.      Plaintiffs, Michael L. Ferguson ("Ferguson"), Myrl C. Jeffcoat ("Jeffcoat") and

Deborah Smith ("Smith")(collectively, "Plaintiffs"), individually and on behalf of the DST

Systems, Inc. 401(k) Profit Sharing Plan (the "DST Plan" or the "Plan"), bring this action under

29 U.S.C. §1132 on behalf of the Plan against Defendants, Ruane Cuniff & Goldfarb Inc.; DST Systems, Inc.; the Advisory Committee of the DST Systems, Inc. 401(k) Profit Sharing Plan; the Compensation Committee of the Board of Directors of DST Systems, Inc.; George L. Argyros; Tim Bahr; Jerome H. Bailey; Lynn Dorsey Bleil; Lowell L. Bryan; Ned Burke; John W. Clark; Michael G. Fitt; Gary D. Forsee; Steven Gebben; Gregg Wm. Givens; Charles E. Haldeman, Jr.; Kenneth Hager; Lawrence M. Higby; Stephen Hooley; Joan Horan; Robert T. Jackson; Gerard M. Lavin; Brent L. Law; Samuel G. Liss; Thomas McDonnell; Jude E. Metcalfe; Travis E. Reed; M. Jeannine Strandjord; Beth Sweetman; Douglas Tapp and Randall Young (collectively, "Defendants"), for breach of fiduciary duties and other violations of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001, *et seq*.

    2.      Defined contribution plans that are qualified as tax-deferred vehicles under Section 401 of the Internal Revenue Code, 26 U.S.C. §§ 401(a) and (k)(*i.e.,* 401(k) plans), have become the primary form of retirement savings in the United States and, as a result, America's *de facto* retirement system.  Unlike traditional defined benefit retirement plans, in which the employer typically promises a calculable benefit and assumes the risk with respect to high fees or under-performance of pension plan assets used to fund defined benefits, 401(k) plans operate in a manner in which participants bear the risk of high fees and investment under-performance.

    3.      Personal savings accounts in the form of 401(k) and other defined contribution plans have become the primary method for employees in the United States to save for retirement in recent years.  The importance of defined contribution plans to the United States retirement system has become increasingly pronounced as employer-provided defined benefit ("DB") plans

have become increasingly rare as an offered and meaningful employee benefit.

      4.     With more than $1 billion in assets, the Plan is in the top one percent (1%) of 401(k) plans in the country in terms of assets.  The marketplace for 401(k) retirement plan services is well established and can be competitive when fiduciaries of defined contribution retirement plans act in an informed and prudent fashion.  Billion dollar defined contribution plans, like the Plan, have significant bargaining power and the ability to demand low-cost administrative and investment management services within the marketplace for administration of 401(k) plans and the investment of 401(k) assets.  As fiduciaries to the Plan, Defendants are obligated to act for the exclusive benefit of participants, invest the assets of the Plan in a prudent fashion and ensure that Plan expenses are fair and reasonable.  At all pertinent times, as explained below, Defendants (a) were fiduciaries under ERISA, and (b) breached their fiduciary duties under ERISA in a myriad of significant ways, to the extreme detriment of the Plan and its participants.

      5.     As explained more fully below, Defendants pursued an exceptionally imprudent investment strategy with respect to a significant portion of the Plan's assets (which they invested without any input or oversight by participants in the Plan) and/or failed to adequately monitor the investments of the Plan and the fiduciaries pursuing this investment "strategy."  As a direct result and consequence of these imprudent investment decisions and related misconduct, the Plan (and, as a result, its participants) has suffered losses well in excess of $100 million.

      6.     Defendants also breached their fiduciary duties by allowing unreasonable expenses to be charged to the Plan for administration of the Plan, and selected and retained

high-cost and poor-performing investments instead of other available and more prudent, alternative investments.  As explained below, these breaches of fiduciary occurred, at least in part, as a result of severe conflicts of interest between and among the fiduciaries of the DST Plan that resulted in repeated prohibited transactions and acts of self-dealing, in violation of Section 406 of ERISA, 29 U.S.C. § 1106.  As a direct result and consequence of these breaches of fiduciary duty and related misconduct, the Plan has suffered losses of tens of millions of dollars.

7.      To remedy these fiduciary breaches and other violations of ERISA, Plaintiffs bring this action on behalf of the Plan under Section 502, 29 U.S.C. §1132, and Section 409 of ERISA, 29 U.S.C. §1109, to recover and obtain all losses resulting from each breach of fiduciary duty, prohibited transaction and other violation of ERISA, to restore to the Plan any profits made through Defendants' use of the Plan's assets and for disgorgement with respect to all fees and compensation received by any of the Defendants in connection with any prohibited transaction. In addition, Plaintiffs seek such other equitable or remedial relief for the Plan as the Court may deem appropriate and just under all of the circumstances.

8.      Plaintiffs specifically bring this action on behalf of the Plan under ERISA §§ 409 and 502, 29 U.S.C. §§ 1109 and 1132, to recover the following relief:

- A declaratory judgment holding that the acts of Defendants described herein violate ERISA and applicable law;

- A permanent injunction against Defendants prohibiting the practices described herein and affirmatively requiring them to act in the best interests of the participants;

- Disgorgement and/or restitution of all payments and other compensation improperly received by Defendants, or, alternatively, the profits earned by Defendants in connection with their receipt of such unlawful payments and

other unlawful compensation;

- Compensatory damages;

- Attorneys' fees, costs and other recoverable expenses of litigation; and

- Such other and additional legal or equitable relief that the Court deems appropriate and just under all of the circumstances.

## II.   THE PARTIES

9.      Plaintiff, Ferguson, is a participant under 29 U.S.C. §1002(7) of the DST Plan, which is a defined contribution, individual account, employee pension benefit plan under 29 U.S.C. §1002(2)(A) and §1002(34).  Plaintiff is a resident of Buckner, Jackson County, Missouri.

10.     Plaintiff, Jeffcoat, is a participant under 29 U.S.C. §1002(7) of the DST Plan, which is a defined contribution, individual account, employee pension benefit plan under 29 U.S.C. §1002(2)(A) and §1002(34).  Plaintiff is a resident of Rancho Cordova, Sacramento County, California.

11.      Plaintiff, Smith, is a participant under 29 U.S.C. §1002(7) of the DST Plan, which is a defined contribution, individual account, employee pension benefit plan under 29 U.S.C. §1002(2)(A) and §1002(34).  Plaintiff is a resident of Glastonbury, Hartford County, Connecticut.

12.     The Plan is established and maintained under a written document in accordance with 29 U.S.C. §1102, and serves as a vehicle for retirement savings and to produce retirement income for employees of DST Systems, Inc. and certain of its subsidiaries and affiliates, including, but not limited to, ALPS Advisors, Inc.; ALPS Fund Services, Inc.; Argus Health Systems, Inc.; Converge Systems, LLC; DST Brokerage Solutions, LLC; DST Direct, LLC; DST

Global Solutions NA, LLC; DST Health Solutions, LLC; DST Mailing Services, Inc.; DST

Market Services, LLC; DST Output, LLC; DST Output Central, LLC; DST Output East, LLC;

DST Output West, LLC; DST Output Electronic Solutions, Inc.; DST Systems of California,

LLC; DST Realty, Inc.; DST Realty of California, Inc.; DST Retirement Solutions, LLC; DST

Technologies, Inc.; DST Worldwide Services, LLC; Finix Professional Services, LLC; Lateral

Group NA, LLC; LTM Publishing, Inc.; MC Realty Group, LLC; McKay Hochman Co., Inc.;

National Financial Data Services, Inc. d/b/a BFDS Midwest; Newkirk Products, Inc.; and

ThirdParty Educational Systems, Inc. (the "DST Affiliates").  DST Systems, Inc. ("DST

Systems") is hereafter referred to individually and/or collectively with the DST Affiliates, as may

be applicable, as "DST" or the "Company."  Retirement income generated by the Plan depends

upon contributions made on behalf of each employee by the Company, deferrals of employee

compensation and employer matching contributions, and from the performance of investment

options (net of fees and expenses) exclusively controlled by the fiduciaries of the Plan.  DST

established a trust (the "Trust") to hold participant and employer contributions and such other

earnings, income and appreciation from Plan investments, less payments made by the Plan's

trustee to carry out the purposes of the Trust, in accordance with 29 U.S.C. §1103.  As of

December 31, 2014, the Plan was one of the country's largest 401(k) plans, with more than $1.4

billion in total assets and over 9,400 participants with account balances.  As of December 31,

2015, the Plan had over $1.3 billion in total assets and more than 9,500 participants with account

balances.

13.     Defendant, Ruane Cuniff & Goldfarb, Inc. ("RCG" or "Ruane"), is a Delaware

corporation and registered investment adviser with its principal place of business in New York, New York.  RCG is an investment firm that served as an investment adviser and fiduciary to the Plan pursuant to 29 U.S.C. § 1002 until approximately August, 2016, when its services to the Plan were terminated.  RCG's flagship fund, the Sequoia Fund, contained more than $25 billion in assets until Ruane engaged in a misguided and reckless investment strategy (detailed below) that was focused upon pursuing investments in Valeant Pharmaceuticals International, Inc.

14.     Defendant, DST Systems, is a corporation organized and existing under the laws of the State of Delaware with its principal place of business in Kansas City, Jackson County, Missouri.  DST Systems is the Plan sponsor and Plan administrator, a designated fiduciary of the Plan and a fiduciary under ERISA pursuant to 29 U.S.C. §§ 1002, 1102.

15.     Defendant, the Advisory Committee of the DST Systems, Inc. 401(k) Profit Sharing Plan (the "Advisory Committee"), is a named fiduciary under the Plan and under ERISA pursuant to 29 U.S.C. §§ 1002, 1102.  The Advisory Committee maintains its address at the headquarters of DST Systems in Kansas City, Jackson County, Missouri.

16.     Defendant, Tim Bahr ("Bahr"), is a member of the Advisory Committee who also serves as DST's Vice President of Finance.  Bahr is a fiduciary to the Plan who maintains his principal business address in Kansas City. Jackson County, Missouri, and his place of residence in Lees Summit, Jackson County, Missouri.

17.     Defendant, Ned Burke a/k/a Edmund J. Burke ("Burke"), is a member of the Advisory Committee and is the Chief Executive Officer of ALPS Holdings, Inc., a division of DST's financial services and asset management business.  Burke is a fiduciary to the Plan who

maintains his principal business address in Denver, Denver County, Colorado, and his place of residence in Centennial, Arapahoe County, Colorado.

18.     Defendant, Steven Gebben ("Gebben"), is a member of the Advisory Committee and also serves as the Vice President of Total Rewards at DST.  Gebben is a fiduciary to the Plan who maintains his principal business address in Kansas City. Jackson County, Missouri, and his place of residence in Kansas City, Platte County, Missouri.

19.     Defendant, Gregg Wm. Givens ("Givens"), is a member of the Advisory Committee who also serves as DST's Senior Vice President, Chief Financial Officer and Treasurer.  Givens is a fiduciary to the Plan who maintains his principal business address in Kansas City. Jackson County, Missouri, and his place of residence in Kansas City, Platte County, Missouri.

20.     Defendant, Joan Horan ("Horan"), is a former member of the Advisory Committee and fiduciary to the Plan, who maintains her place of residence in Overland Park, Johnson County, Kansas.

21.     Defendant, Kenneth Hager ("Hager"), is a former member of the Advisory Committee and fiduciary to the Plan, who maintains his place of residence in Shawnee Mission, Johnson County, Kansas.

22.     Defendant, Stephen Hooley ("Hooley"), is a former member of the Advisory Committee and fiduciary to the Plan, who maintains his place of residence in Mission Hills, Johnson County, Kansas.

23.     Defendant, Gerard M. Lavin ("Lavin"), is a former member of the Advisory

Committee and fiduciary to the Plan, who maintains his place of residence in Tijeras, Bernalillo County, New Mexico.

24.     Defendant, Thomas McDonnell ("McDonnell"), is a former member of the Advisory Committee and fiduciary to the Plan, who maintains his place of residence in Kansas City, Jackson County, Missouri.

25.     Defendant, Jude C. Metcalfe ("Metcalfe"), is a member of the Advisory Committee and serves as an Organizational Transition Leader at DST.  Metcalfe was the President of DST Retirement Solutions and also was a Senior Vice President and Head of Retirement Services at Boston Financial Data Services, Inc., which was established as a joint venture of DST and State Street Corporation (which will or has recently become a wholly-owned subsidiary of DST).  Metcalfe is a fiduciary to the Plan who maintains his principal business address in Quincy, Norfolk County, Massachusetts, and his place of residence in Walpole, Norfolk County, Massachusetts.

26.     Defendant, Beth Sweetman a/k/a Mary Elizabeth Sweetman ("Sweetman"), is a member of the Advisory Committee who also serves as DST's Senior Vice President and Chief Human Resources Officer.  Sweetman is a fiduciary to the Plan who maintains her principal business address in Kansas City. Jackson County, Missouri, and her place of residence in Kansas City, Jackson County, Missouri.

27.     Defendant, Douglas Tapp ("Tapp"), is a former member of the Advisory Committee and fiduciary to the Plan, who maintains his principal place of residence in Reston, Fairfax County, Virginia.

28.     Defendant, Randall Young ("Young"), is a former member of the Advisory Committee and fiduciary to the Plan, who maintains his place of residence in Leawood, Johnson County, Kansas.

29.     Defendants, the Advisory Committee, Bahr, Burke, Gebben, Givens, Hager, Hooley, Horan, Lavin, McDonnell, Metcalfe, Sweetman, Tapp and Young, all were members of the Advisory Committee at pertinent times and are referred to herein collectively as the "Advisory Committee" or the "Advisory Committee Defendants."

30.     Defendant, the Compensation Committee of the Board of Directors of DST Systems, Inc. ("Compensation Committee"), has the sole authority to appoint and remove members of the Advisory Committee, amend or terminate, in whole or part, the Plan or the Trust, and is a named fiduciary under the Plan and under ERISA pursuant to 29 U.S.C. §§ 1002, 1102. The Compensation Committee maintains its address at the headquarters of DST Systems in Kansas City, Jackson County, Missouri.

31.     Defendant, George L. Argyros ("Argyros"), is a former Director of DST and former member of the Compensation Committee and, by virtue of that membership, was a fiduciary of the Plan.  Argyros resides in Newport Beach, Orange County, California.

32.     Defendant, Jerome H. Bailey ("Bailey"), is a Director of DST, a member of the Compensation Committee and, by virtue of that membership, a fiduciary of the Plan.  Bailey is currently a resident of Cortez, Manatee County, Florida.

33.     Defendant, Lynn Dorsey Bleil ("Bleil"), is a Director of DST, a member of the Compensation Committee and, by virtue of that membership, a fiduciary of the Plan.  Bleil is

-10-

currently a resident of Park City, Summit County, Utah.

34.     Defendant, Lowell L. Bryan ("Bryan"), is a Director of DST, a member of the
Compensation Committee and, by virtue of that membership, a fiduciary of the Plan.  Bryan is
currently a resident of Key Largo, Monroe County, Florida.

35.     Defendant, John W. Clark ("Clark"), is a former Director of DST and former
member of the Compensation Committee and, by virtue of that membership, was a fiduciary of
the Plan.  Clark resides in Laguna Beach, Orange County, California.

36.     Defendant, Michael G. Fitt ("Fitt"), is a former Director of DST and former
member of the Compensation Committee and, by virtue of that membership, was a fiduciary of
the Plan.  Fitt resides in Kansas City, Jackson County, Missouri.

37.     Defendant, Gary D. Forsee ("Forsee"), is a Director of DST, a member of the
Compensation Committee and, by virtue of that membership, a fiduciary of the Plan.  Forsee is
currently a resident of Columbia, Boone County, Missouri.

38.     Defendant, Charles E. Haldeman, Jr. ("Haldeman"), is a Director of DST, a
member of the Compensation Committee and, by virtue of that membership, a fiduciary of the
Plan.  Haldeman is currently a resident of Haverford, Montgomery County, Pennsylvania.

39.     Defendant, Lawrence M. Higby ("Higby"), is a former Director of DST and
former member of the Compensation Committee and, by virtue of that membership, was a
fiduciary of the Plan.  Higby resides in Newport Beach, Orange County, California.

40.     Defendant, Brent L. Law ("Law"), is a former Director of DST and former
member of the Compensation Committee and, by virtue of that membership, was a fiduciary of

the Plan.  Law resides in Rancho Santa Margarita, Orange County, California.

     41.    Defendant, Samuel G. Liss ("Liss"), is a Director of DST, a member of the

Compensation Committee and, by virtue of that membership, a fiduciary of the Plan.  Liss is

currently a resident of Mill Neck, Nassau County, New York.

     42.    Defendant, Robert T. Jackson ("Jackson"), is a former Director of DST and

former member of the Compensation Committee and, by virtue of that membership, was a

fiduciary of the Plan.  Jackson resides in Kansas City, Jackson County, Missouri.

     43.    Defendant, Travis E. Reed ("Reed"), is a former Director of DST and former

member of the Compensation Committee and, by virtue of that membership, was a fiduciary of

the Plan.  Reed resides in Sun Valley, Blaine County, Idaho.

     44.    Defendant, M. Jeannine Strandjord ("Strandjord"), is a former Director of DST

and former member of the Compensation Committee and, by virtue of that membership, was a

fiduciary of the Plan.  Strandjord resides in Leawood, Johnson County, Kansas

     45.    Defendants, the Compensation Committee, Argyros, Bailey, Bleil, Bryan, Clark,

Fitt, Forsee, Haldeman, Higby, Jackson, Law, Liss, Reed and Strandjord were all members of the

Compensation Committee at pertinent times and are referred to herein collectively as the

"Compensation Committee" or the "Compensation Committee Defendants."

     46.    The Advisory Committee Defendants and the Compensation Committee

Defendants are referred to herein collectively as the "DST Defendants."

     47.    DST has the ultimate discretionary authority or control regarding management of

the Plan or management or disposition of the Plan's assets, and administered the Plan through the

Compensation Committee and officers and employees of DST, including members of the Advisory Committee.

### III.   JURISDICTION AND VENUE

48.    Plaintiffs seek relief on behalf of the Plan pursuant to ERISA's civil enforcement remedies with respect to fiduciaries and other interested parties and, specifically, under ERISA Sections 409 and 502, 29 U.S.C. §§ 1109 and 1132.

49.    This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 and ERISA Section 502(e), 29 U.S.C. § 1132(e).

50.    Venue is proper in this judicial district pursuant to ERISA Section 502(e), 29 U.S.C. § 1132(e) and 28 U.S.C. § 1391, because RCG maintains its headquarters and principal place of business in New York, New York.  At all pertinent times, RCG has conducted its investment advisory business and provided services to the Plan from its offices in this judicial district in New York, New York, which offices function as the nerve center for the operations of RCG.  At all pertinent times, the PSA (defined below) was administered in New York, New York, by RCG, which also provides additional investment advisory services to the Plan forming the substantial bases for this action from New York, New York.  In addition, the majority or a significant number of the acts and omissions giving rise to this action and the losses suffered by the Plan arose and were directed from this judicial district.

### IV.   BACKGROUND FACTS

**A.    The Composition Of The DST Plan**

51.    At all pertinent times, the DST Plan consisted of two components: a 401(k)

portion, which is participant-directed and a Profit Sharing Account ("PSA"), in which the assets were invested by the Trustee of the Plan, as advised by an investment advisory firm (*i.e.*, RCG) selected and monitored by the Advisory Committee; *i.e.*, the assets are not participant-directed. As discussed below, until recently (December 31, 2014), the DST Plan also included an investment option that permitted participants to invest in DST stock (the "Company Stock Fund"). The PSA was terminated in 2016 when the Plan terminated the services of RCG, at which time all of the investments in the Plan became participant-directed.

52. This past arrangement in which the PSA was not participant-directed is extremely unusual (since PSA assets almost always are participant directed), and resulted in the entire Plan or, at a minimum, that PSA portion of the Plan losing the protection of Section 404(c) of ERISA.

**B.      The PSA Portion Of The DST Plan**

53. The PSA was structured by DST to provide a projected level of benefits through contributions by the Company invested in a manner that DTS, the Advisory Committee Defendants and Ruane (as the investment adviser to the PSA) had supposedly determined would achieve a desirable, aggressive, long-term rate of return -- in essence, an investment strategy akin to that of a DB plan -- without the obligation for the Company to make any contributions in the event of an investment return short-fall or provide any guaranteed benefit. As detailed below, the assets of the PSA were invested in a reckless and imprudent manner by Ruane to the severe detriment of the Plan (and thereby, its participants), which has suffered losses in excess of $100 million as a result of the breaches of duty detailed in this Complaint. In sum, with respect to the retirement savings of Plan participants, as detailed below, Ruane (under the oversight and with

the consent of DST and the Advisory Committee Defendants) gambled with these Plan assets by

failing to appropriately diversify the investment of the Plan's assets and pursuing risky,

inappropriate investment strategies, while the Compensation Committee Defendants failed to

fulfill their duties to supervise the Advisory Committee Defendants.  In addition, the Plan

participants were not provided with meaningful and timely guidance regarding the nature of the

investments held in the PSA or any specific or meaningful and timely information regarding the

investment objectives or investment components of the PSA.

54.     With respect to the PSA portion of the Plan, RCG, the Company and the other

Defendants specifically gambled (or permitted other Defendants to gamble) over one-third of the

Plan's employee retirement assets in an opaque, high-cost, high-risk, long-term investment

strategy.  While the Plan purports to be designed to obtain the protections of Section 404(c) of

ERISA and, under Section 404(c), Plan fiduciaries may be relieved of liability for poor

investment decisions made by Plan participants, at a minimum and at all pertinent times, the

investments in the PSA did not qualify for Section 404(c) protection because Defendants directly

or indirectly control these investments with absolutely no participant input or control.  Moreover,

since DST and the Advisory Committee Defendants forcibly allocated (and the Compensation

Committee Defendants permitted the forceable allocation of) approximately one-third of the

Plan's assets into an opaque, high-cost, high-risk investment vehicle (*i.e.,* the PSA), which Ruane

mismanaged in a shockingly reckless manner, the Plan's entire investment menu was tainted and

none of the investments in the Plan qualify for Section 404(c) protection because these

Defendants effectively eliminated the opportunity for participants to diversify their retirement

savings and investments at all times that RCG managed the PSA and the Plan contained

significant assets that were not participant directed.  As detailed further below, at all pertinent

times, Ruane managed and controlled the investments contained in the PSA in an unfettered and

effectively unsupervised manner and pursued an investment strategy with respect to the PSA that

was exceptionally reckless and imprudent, and demonstrated an absence of knowledge,

appreciation or expertise as to how retirement funds should be managed and invested.

55.     Participants in the Plan were prevented from receiving meaningful information

regarding the investment objectives of the PSA.  Participants did not receive regular updates or

meaningful information regarding the investment objectives of or the securities or other

investments contained in the PSA.  Instead, participants in the Plan simply received periodic,

post-hoc reports regarding the performance of the PSA that provided generalized information

regarding the return (or lack thereof) achieved in connection with the investment of the PSA.

Although Plan participants were permitted to obtain additional information regarding the

retrospective performance of the PSA of a limited nature in more recent years, Plan participants

literally had no means to monitor the current investments contained in the PSA in order to

otherwise diversify their retirement investments based upon the current and existing investments

in the PSA -- about which participants literally received no meaningful disclosure or information.

56.     The limited information provided to Plan participants regarding the investment

objectives of the PSA bordered on the absurd.  Specifically, the information provided regarding

the PSA's investment objectives simply stated that the PSA had an investment objective "to

achieve positive growth over the long term."  That generic description of the PSA's investment

objective (which presumably applies to all investment funds, including retirement investment funds), provided absolutely no guidance or insight regarding the investment strategy or investment components of the PSA.  Moreover, there were no asset class limitations or other restrictions or guidelines imposed with respect to the investments contained in the PSA, and none of the information provided to Plan participants contained a meaningful description of the investment objectives of the PSA or the existence (or lack thereof) of any asset class limitations or other investment restrictions or guidelines.  Instead, participants were provided with the essentially meaningless information that the PSA sought to achieve positive growth over the long term, which characterizes virtually every retirement investment of any kind.  Ironically, with respect to the non-PSA portion of the Plan (discussed below), Defendants consistently advised participants that they should not invest in any of the investments chosen by the Advisory Committee as available investments (*i.e.*, the mutual funds discussed below) without first carefully reading the prospectus associated with the investment.  But, in the case of the PSA, in which over one-third of the Plan's assets were invested, there was no ability on the part of Plan participants to obtain timely or meaningful information. Thus, at all pertinent times, participants were effectively prevented from obtaining any information regarding the current investments or holdings of the PSA.

57.    Even if Defendants had fully disclosed to participants the investment objectives, strategies and portfolio holdings of the PSA (which, as discussed above and below, they did not), participants could not properly diversify their retirement investments by simply eliminating risks related to the PSA by diversifying the other two-thirds of their retirement assets.  That is because

the PSA constituted such a significant portion of the Plan's investments and assets that

participants did not have a meaningful opportunity or means to properly diversify their retirement

investments in the Plan, given the dominance of the PSA within the Plan.  As detailed below, the

Trustee of the Plan specifically advised participants to avoid over-concentration by investing

retirement assets in one industry or security with more than 20% of their retirement assets

contained in the non-PSA portion of the Plan (discussed below).  Amazingly, as discussed below,

Defendants and RCG utterly failed to heed this same advice and, as a result, lost over $100

million in Plan assets by failing to adequately diversify the PSA.

   58. At all pertinent times, there was absolutely no transparency with respect to the

investments in the PSA or the risk level that the Advisory Committee authorized RCG to pursue

in connection with the investments in the PSA.  When participants inquired as to the investment

strategy of the PSA and/or the nature of the investments held in the PSA, the Company

responded that participants should not worry because "the Company invests this for you."

**C.** **RCG's Investment Management Of The PSA**
  **And The Relationship Between RCG And DST**

   59. DST has a significant financial services/investment advisory business itself -- with

the Company's financial services/investment advisory business contributing almost 50% of the

Company's revenues.  It appears that many of the investment managers retained by DST to

manage 401(k) assets have business relationships with DST.  Moreover, the sole investment

manager selected by the Advisory Committee to manage the PSA, RCG, has had a relationship

with the Company that "goes back decades-to the 1980s."

   60. The Plan's Summary Plan Description ("SPD") advises participants that "[a]ll

-18-

Profit Sharing Contributions made by the Employer to the Plan on your behalf will be invested

by the Trustee as advised by Ruane, Cunniff & Goldfarb, Inc., the investment adviser selected by

the Advisory Committee to manage these funds" and "[y]ou may not direct the investment of

these funds into other investment alternatives."

61.      RCG is an investment advisory firm which has managed the historically

successful Sequoia Fund Inc. (the "Sequoia Fund") for decades.  RCG and Berkshire Hathaway's

Warren Buffett had a longstanding personal relationship -- Buffett referred clients to RCG's

Sequoia Fund when he closed his investment partnership in 1969 and the mutual fund, since first

buying Berkshire Hathaway stock about 20 years ago, has made it a major holding.

62.      At one point, Berkshire Hathaway holdings accounted for nearly 40% of the

Sequoia Fund portfolio.  Indeed, it appears that the Sequoia Fund's historical returns were due to

its Berkshire Hathaway holdings and, once the fund began reducing Berkshire Hathaway

holdings, it has underperformed the S&P 500.  Berkshire Hathaway Class A is the second largest

holding in the Sequoia Fund and Berkshire Hathaway Class B is the Sequoia Fund's fifth largest

holding, for a total of 11% of assets under management.

63.      Critics have observed that two of the founders of RCG are no longer living;

performance has suffered in recent years and the reputation the firm has enjoyed for so many

years is no longer deserved.  These are all factors which the Advisory Committee should have

considered in deciding whether to continue to retain the firm as the Company's PSA investment

manager.

64.      DST serves as the registrar and shareholder servicing agent for the Sequoia Fund.

-19-

DST provides investor recordkeeping, performance communications and other information to shareholders of the Sequoia Fund and has other administrative responsibilities with respect to the Sequoia Fund.  Ironically, while the Sequoia Fund is fully transparent to investors due, in part, to DST handling shareholder communications, the PSA (which "mirrored" the Sequoia Fund in a separate account, even though the status of the PSA as a "clone fund" of the Sequoia Fund was never disclosed to Plan participants) is highly opaque.  Since the Sequoia Fund was designed as an investment vehicle for high net worth individuals with ample funds to gamble and lose, RCG's decision to simply mimic the investments of the Sequoia Fund in the PSA was reckless and imprudent because Ruane gave absolutely no consideration to the fact that the PSA contained retirement funds and, therefore, the investment objectives of the PSA necessarily should be tailored to recognize that plain fact.  Likewise, DST and the Advisory Committee Defendants breached their fiduciary duties by failing to adequately supervise RCG and insist upon an appropriate investment strategy for the PSA, while the Compensation Committee failed to fulfill its duties to supervise these Defendants.

65.      DST, as an ERISA fiduciary, has failed to provide participants with meaningful and timely information about the PSA, which DST possesses and routinely provides to Sequoia Fund shareholders as the shareholder servicing agent of the mutual fund.  Given the longstanding financial relationship between the Company and the Sequoia Fund, the selection of RCG to manage the PSA raises significant self-dealing concerns under ERISA.  Both the Company and RCG were ERISA fiduciaries and, as such, each is prohibited from using the Plan's assets in its own interests.  Here, however, the Sequoia Fund paid compensation to DST and the Plan paid

compensation to the Sequoia Fund's manager, RCG, to mirror, *i.e.*, support the Sequoia Fund's investment strategies.

66.     Even if the initial selection of RCG by the Advisory Committee was somehow prudent (putting aside *arguendo* questions of self-dealing), it bears noting that RCG has experienced significant management changes in recent years, as well as reduced its longstanding and significant reliance upon Berkshire Hathaway stock amid faltering performance, factors which the Advisory Committee apparently failed to monitor consistent with its fiduciary duties to the Plan.

67.     During its time as the investment adviser to the PSA, RCG charged the Plan a 1% "flat" fee to manage the PSA.  The 1% flat fee paid to RCG to separately manage the PSA was and is grossly excessive.  That fee is the same fee that RCG charges retail investors in the Sequoia Fund.  Flat fees for traditional asset management mandates are exceptionally rare. DST's $750 million institutional account easily could have negotiated a much lower fee -- with breakpoints -- than that offered to retail investors in the Sequoia Fund.  Defendants should have ensured that the asset management fee paid to Ruane was significantly less than the 1% flat fee paid by the Plan.   Indeed, RCG's Form ADV Part II indicates that, for managed accounts, the Adviser "typically" charges a 1% fee, but that "fees may be negotiable under certain circumstances or for certain managed account clients."  Here, the failure by the Advisory Committee to negotiate a lower investment management fee payable to RCG (and the Compensation Committee's apparent failure to monitor or evaluate the Advisory Committee's acts and ommissions) reflects an abject failure on the part of these fiduciaries in terms of

procedural and substantive prudence and a blatant breach of fiduciary duty. If the Advisory Committee had obtained any competent advice or engaged in any due diligence with respect to the fees being paid to RCG, or if the Compensation Committee had monitored the Advisory Committee to ensure that it was receiving competent and unbiased advice, it would have immediately discovered that the fees being paid to RCG were grossly excessive under all of the circumstances and that millions of dollars in excessive fees were being paid to RCG by the Plan.

68.     The Advisory Committee also apparently failed to police or object to RCG's dubious practice of engaging in self-dealing with respect to substantially all securities transactions. RCG's Form ADV Part II states that Ruane and one of its supervised persons receive compensation in connection with the purchase and sale of substantially all securities through RCG's affiliated broker-dealer. Even if allegedly undertaken in compliance with an applicable ERISA exemption, it was objectively unreasonable for the Advisory Committee to permit such self-dealing as a fiduciary solely focused upon the best interests of the Plan. There is absolutely no benefit to the Plan from permitting this self-dealing arrangement involving substantially all of the PSA's trading activity, which only benefits RCG and effectively results in the Plan paying RCG even more excessive and unreasonable compensation.

69.     As participants in the Plan belatedly learned, RCG shockingly invested an enormous and imprudent amount of the PSA in the stock of Valeant Pharmaceuticals International, Inc. ("VRX" or "Valeant"). According to the Plan's financial statements at year-end 2014, the PSA held approximately $225 million of VRX in non-participant directed assets, or almost 30% of its assets in 1,572,207 shares of Valeant with a cost of $38.2 million.

According to published reports, as of June 2015, the Sequoia Fund held approximately 35% of its assets in Valeant, confirming the fact that the PSA mirrored the Sequoia Fund and acted as a clone of this mutual fund.  Indeed, at times, VRX accounted for almost 50% of the value of the PSA.

70.     RCG, as an investment adviser to the Plan, was an ERISA fiduciary.  RCG's investment of more than 30% percent (and, at times, almost 50%) of the PSA's assets in Valeant stock constituted a significant and shocking breach of fiduciary duty, since RCG failed to adequately diversify its investments in the PSA and otherwise breached its fiduciary duties by concentrating the PSA in one high-risk investment.

71.     The 52-week high of Valeant stock placed the PSA's interest in VRX at an approximate value of $414.7 million while, as of March 4, 2016, the PSA's interest in VRX had declined to as low as $61.31 per share, representing a total value of under $97 million -- a shocking loss in value of more than $300 million of the PSA's value from its approximate high. The investment of such a significant portion of the PSA's portfolio value in one security was highly imprudent and an abject breach of fiduciary duty.

72.     Making matters even worse, it is highly unlikely that RCG, as the PSA investment manager, could sell its sizable Valeant holdings at the quoted price.  That is because the PSA and RCG, in its role as the manager of the Sequoia Fund, was such an active participant in VRX, holding over 10% of Valeant stock in the Sequoia Fund alone -- not to mention RCG's other indirect holdings of VRX through separate accounts, such as the PSA.

73.     Approximately one-third of all Plan assets are held in the PSA.  Participants who

are depending upon these assets for their retirement security had no effective choice currently available to them, but to endure the Valeant stock roller-coaster ride that RCG placed them upon and the Advisory Committee and the other Defendants enabled by selecting, retaining and remaining with RCG, despite obvious and compelling reasons to replace RCG.

74.     The Advisory Committee remained with RCG until the summer of 2016 as a result of a significant failure in terms of procedural and substantive prudence, as well as due, in part, to a longstanding, symbiotic relationship between the Company and the PSA investment manager, RCG.  An earlier termination of RCG, which is a battered investment manager that has been mired in litigation and has been plagued with redemptions, dismal performance and director resignations in the face of poor investment performance and the VRX investment debacle, from its role as the Plan's investment adviser would have been disastrous to RCG but obviously was in the compelling interest of the Plan.

75.     The Advisory Committee and other Defendants, by explicitly and implicitly supporting RCG in the face of the apparent breaches of fiduciary duty by RCG and its extreme departures from sound investment strategies with respect to the retirement assets contained in the PSA, as well as by failing to pursue action against RCG, only can be rationally viewed as a misguided and unreasonable decision to support RCG in the face of compelling evidence that RCG had breached its fiduciary duties as an investment adviser to the Plan.  By failing to act to promptly remove RCG and remedy its breaches of fiduciary duty, Defendants and the PSA effectively supported and propped up RCG at a time critical to RCG, to the benefit of RCG and the detriment of the Plan and its participants.

76.     Perversely, the PSA assets, which participants could not redeem, were used to support the price of the Valeant stock in the Sequoia Fund, an open-end mutual fund from which investors can redeem their shares at any time.

77.     At all pertinent times, RCG, as the investment adviser to the PSA, was responsible for prudently investing the assets of the PSA in the sole interest of the Plan participants.  RCG breached its fiduciary duties by recklessly and imprudently investing the assets of the PSA in its own interest.

78.     At all pertinent times, DST and the Advisory Committee were legally responsible for monitoring the investments undertaken by RCG in the PSA, and the Compensation Committee was legally responsible for monitoring the activities of the Advisory Committee with respect to the PSA.  In light of the shocking breaches of fiduciary duty by RCG when investing the PSA assets, and failing to properly diversify those investments, it is apparent that DST, the Advisory Committee and the Compensation Committee all breached their fiduciary duties with respect to monitoring the investment activities in the PSA and the oversight of RCG.

**D.      The Remaining/Non-PSA Portion Of The Plan And Defendants' Breaches Of Duty**

79.     In addition to the severe breaches of fiduciary duty with respect to the retirement assets in the PSA, the remaining portion of the Plan has been severely mismanaged by DST, the Advisory Committee Defendants and the Compensation Committee Defendants as well.  At all pertinent times, the expense ratios of many of the mutual funds included in the DST Plan were plainly excessive in nature and have resulted in the Plan paying tens of millions of dollars in excessive fees to mutual funds, their investment managers and similar investment instruments

offered to participants in the non-PSA portion of the Plan.

80.     Participants in the Plan were required to pay excessive fees for the mutual funds and other investments offered in the non-PSA portion of the Plan ("mutual funds"), which are, on their face, unreasonable in many instances and often are multiples higher than the amounts they should be (when compared to the expense ratios that would be associated with typical mutual fund share classes held in retirement plan assets of the same or similar size of the DST Plan), based upon the market and negotiating power of the Plan.

81.     Plan participants also are charged significant and excessive individual participant fees that range from 29-35 basis points ("bps"), which result in a total cost to participants of approximately 150 bps (*i.e.*, 1.5%), a shockingly high participant cost for investments in a retirement plan with the assets and market power of the DST Plan.

82.     The non-PSA portion of the Plan also contained the following investment option: the BMO Prime Money Market Fund, a Plan investment that is managed by an affiliate of the Trustee of the Plan, BMO Harris Bank, N.A. ("BMO"), n/k/a OneAmerica Retirement Services LLC ("OneAmerica") -- after OneAmerica acquired BMO's U.S. retirement services business in 2015 -- investments in which qualify as party-in-interest transactions in light of the relationship between this investment option and the Plan's trustee.

83.     The $3.8 billion BMO Prime Money Market Class Y in which the Plan was invested has an extremely high expense ratio of 46 bps and has performed 1.25% over the past 10 years.  In contrast, the $140 billion Vanguard Prime Money Market Fund expense ratio is 10 bps and has delivered 1.40% over the same period.  Moreover, the BMO Prime Money Market Fund

Premier Class charges less than one-half the expense ratio of the BMO share class in which the Plan invests -- 21 bps -- thereby rendering the inclusion of the Class Y share class of this money market unjustifiable from the perspective of substantive and procedural prudence.  Finally, the Plan does not offer a stable value investment that could have ensured participants a minimum guaranteed investment return of at least 3% per annum.

84.     In terms of historical performance, certain of the mutual fund investments offered in the non-PSA portion of the Plan, including Fidelity Advisor Growth Opportunities, Dreyfus Intermediate Income, and Lord Abbett Affiliated Fund, are poorly rated by Morningstar and would not have been maintained in the Plan by any prudent fiduciaries.  The decision by DST and the Advisory Committee Defendants to include poor performing, expensive mutual funds as investment options within the Plan is inexplicable.  Moreover, given the extraordinary breaches of duty by DST and the Advisory Committee Defendants with respect to the non-PSA portion of the Plan, it is apparent that the Compensation Committee Defendants engaged in no meaningful supervision of DST and the Advisory Committee Defendants, despite their obligation to do so.

85.     The failure by DST and the Advisory Committee Defendants to monitor the investments in the Plan to ensure that they provided adequate available returns and were not excessively priced, as were the vast majority of the investments in the non-PSA portion of the Plan, including the BMO Primary Money Market Class Y, constituted breaches of fiduciary duty.  Indeed, the DST Plan is an exceptionally expensive plan in terms of total plan cost when compared to defined contribution retirement plans of a similar size.

86.     At all pertinent times, DST and the Advisory Committee were responsible for

-27-

selecting and monitoring the investments in the non-PSA portion of the Plan.

87.     Ironically, client statements provided by BMO n/k/a OneAmerica specifically warn that "[i]f you invest more than 20% of your retirement savings in any one company or industry, your savings may not be properly diversified."  As discussed above, however, RCG, the sole PSA investment manager, invested almost 50% of that account in a single stock (Valeant) and the PSA suffered enormous losses as a result of this lack of proper diversification.

88.     DST and the Advisory Committee Defendants breached their fiduciary duties by imprudently failing to monitor the fees charged directly and indirectly to the Plan and its participants, and by failing to ensure that such fees were fair and reasonable under all of the circumstances.

89.     DST and the Advisory Committee breached their fiduciary duties by failing to offer appropriate investments in the non-PSA portion of the Plan and by failing to ensure that the returns, performance, fees and expenses associated with these investments were fair and reasonable.

90.     At all pertinent times, DST and the Advisory Committee were legally responsible for monitoring the investments in the non-PSA portion of the Plan, and the Compensation Committee was legally responsible for monitoring the activities of DST and the Advisory Committee with respect to the PSA.  In light of the apparent breaches of fiduciary duty with respect to the non-PSA portion of the Plan in terms of both poor investment options and blatantly excessive fees, it is apparent that DST, the Advisory Committee and the Compensation Committee all breached their fiduciary duties with respect to monitoring the investment

alternatives offered in the non-PSA portion of the Plan.

### E.     The Company Stock Fund

91.     On October 23, 2014, the Plan was amended to eliminate DST's common stock as an investment option beginning on January 1, 2015.  Participants were advised to transfer the stock fund balance to any of the other investments available.  Any remaining investments in the stock fund were liquidated and the proceeds were automatically invested in a Vanguard Balance Fund.

92.     The Company's stock had been a solid performer (more than double S&P 500 over past five years and almost double over the past 10 years).  The Company Stock Fund may have been eliminated due to regulatory or concentration concerns.  Ironically, these same concerns did not cause the Company to eliminate the non-participant directed PSA in 2014, despite the obvious propensity for the PSA to become over-concentrated, as demonstrated by the Valeant stock debacle and the fact that the PSA, by its very nature, prevented participants from appropriately diversifying their retirement investments and assets.

93.     It appears that the Company Stock Fund in which the Plan was invested until the end of 2014 underperformed DST's stock performance itself because Defendants failed to effectively monitor the management of the Company Stock Fund assets and, as a result, the DST Company Stock Fund option underperformed DST's stock performance more than it should have, presumably due to cash drag on the Company Stock Fund.

94.     As a result of Defendants' breaches of fiduciary duty by failing to effectively monitor and manage the Company Stock Fund, participants in the Plan suffered significant

losses.

**F.**     **Defendants' Other And Related Breaches Of Duty**

95.     The Advisory Committee also exercises discretion with respect to participant investments by determining where participant contributions will be directed if a participant fails to provide direction as to where certain assets should be invested.  The Advisory Committee, however, has failed to advise participants where such assets are invested and how the Advisory Committee exercises its discretion with respect to participant contributions for which an investment direction or selection has not been provided or received.

96.     Academic and financial industry literature shows the importance of low fees in selecting investments.  Numerous scholars have demonstrated that high expenses are not correlated with superior investment management.  Indeed, funds with high fees on average perform worse than less expensive funds, even on a pre-fee basis.  Virtually no investment manager consistently beats the market over time after fees are taken into account.  If an individual, high-cost mutual fund exhibits market-beating performance over a short period of time, studies demonstrate that higher performance during a particular period is not predictive of whether a mutual fund will perform well in the future.  The worst-performing mutual funds, however, show a strong, persistent tendency to continue their poor performance.

97.     To the extent managers show any sustained ability to beat the market, the higher performance is nearly always dwarfed by mutual fund expenses.  Accordingly, investment costs are of paramount importance to prudent investment selection, and a prudent investor will not select higher-cost, actively managed funds without a documented process to realistically

conclude that the fund is likely to be that extremely rare exception, if one even exists, that will outperform its benchmark index over time, net of investment expenses.

98.     Defendants selected high-priced share classes of mutual funds, instead of identical or available lower-cost share classes of those same mutual funds which were readily available to the Plan.  Defendants also failed to adequately investigate and to offer non-mutual fund alternatives, such as collective trusts and separately managed accounts, that would have been lower priced and effectively provided the same investment options to participants.

99.     Upon information and belief, DST and the Advisory Committee Defendants also failed to conduct a competitive bidding process for the Plan's recordkeeping services and investment management services.  A competitive bidding process for the Plan's recordkeeping and investment management services would have produced reasonable and more competitive fees for the Plan.  In addition, a competitive bidding process would have enabled DST and the Advisory Committee Defendants to select a recordkeeper and investment manager charging reasonable fees, to negotiate a reduction in fees, and to rebate any excess expenses paid by participants for recordkeeping and investment management services.

100.     DST and the Advisory Committee Defendants failed to prudently monitor and control the recordkeeping and investment management compensation to ensure that only reasonable fees were charged for such services.

101.     Had DST and the Advisory Committee Defendants ensured that participants were only charged reasonable fees for administrative, recordkeeping and investment management services, Plan participants would not have lost millions of dollars in their retirement savings

through unreasonable fees.

102.    Ruane, DST and the Advisory Committee Defendants breached their fiduciary duties by failing to ensure that Plan participants received timely, accurate and fulsome information regarding the investments in the PSA and regarding the investment objectives of the PSA.

103.    DST and the Advisory Committee Defendants controlled the available investment options in which the participants could invest their retirement assets, as well as the fees and expenses paid by Plan participants.  DST and the Advisory Committee Defendants failed in and breached their fiduciary duties to the Plan and its participants, based upon all of the conduct described above, including the failure to ensure that the Plan contained appropriate investments and that the Plan paid reasonable, as opposed to excessive, fees and expenses.

104.    The Compensation Committee Defendants breached their fiduciary duties by failing to adequately supervise DST and the Advisory Committee Defendants.

## V.   ERISA'S FIDUCIARY STANDARDS

105.    ERISA imposes strict fiduciary duties of loyalty and prudence upon the Defendants as fiduciaries of the Plan.  29 U.S.C. §1104(a), states, in relevant part, as follows:

> [A] fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and -
>
> (A)    for the exclusive purpose of
>
> (I)    providing benefits to participants and their beneficiaries; and
> (ii)    defraying reasonable expenses of administering the plan;
>
> [and]

-32-

> (B)     with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims.

106.    Under 29 U.S.C. 1103(c)(l), with certain exceptions not relevant here,

> the assets of a plan shall never inure to the benefit of any employer and shall be held for the exclusive purposes of providing benefits to participants in the plan and their beneficiaries and defraying reasonable expenses of administering the plan.

107.    Under ERISA, fiduciaries that exercise any authority or control over plan assets, including the selection of plan investments and service providers, must act prudently and solely in the interest of participants in a plan.

108.    ERISA's fiduciary duties are "the highest known to the law" and must be done "with an eye single" to the interests of participants.

109.    ERISA also imposes explicit co-fiduciary liabilities on plan fiduciaries.  29 U.S.C. §1105(a) provides a cause of action against a fiduciary for knowingly participating in a breach by another fiduciary and knowingly failing to cure any breach of duty.  ERISA states, in relevant part, as follows:

> In addition to any liability which he may have under any other provision of this part, a fiduciary with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan in the following circumstances:

> (1)     if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach; or

> (2)     if, by his failure to comply with section 404(a)(l) in the administration of his specific responsibilities which give risk to his status as a fiduciary, he has enabled such other

fiduciary to commit a breach; or

(3)    if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

110.    29 U.S.C. §1132(a)(2) authorizes a plan participant to bring a civil action to enforce a breaching fiduciary's liability to the plan under 29 U.S.C. §1109.  Section 1109(a) provides, in relevant part:

Any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary.

## <u>COUNT I</u>
### (For Breach Of Fiduciary Duty And Violation Of ERISA's Prohibited Transaction Rules)

111.    Plaintiffs incorporate the allegations in the previous paragraphs of this Complaint as if fully set forth herein.

112.    Defendants are fiduciaries of the Plan under ERISA, as explained above, and are fiduciaries based on the discretion, authority and/or control with respect to the administration, management and/or disposition of the Plan and its assets, and/or provision of investment advice for a fee or other compensation with respect to the monies or other property of the Plan and Defendants' authority and responsibility with respect to the administration and management of the Plan and its retirement assets.

113.    Defendants control the selection of the mutual funds available as investment options for the Plan and its participants, provide investment advice for compensation with

respect to these investment options, and/or use their discretionary authority and responsibility in the administration of the Plan to earn other compensation from self-dealing as described above.

114.    Defendants are prohibited from receiving benefits in connection with their positions as fiduciaries of the Plan.  At all pertinent times, Defendants have violated their fiduciary duties of prudence, loyalty and/or of monitoring under ERISA, as set forth herein.

115.    As detailed above, Defendants have engaged in and continue to engage in severe breaches of fiduciary duty with respect to the investments in the PSA and non-PSA portions of the Plan, in violation of ERISA § 404, 29 U.S.C. § 1104, by failing to (a) discharge their duties with respect to the Plan solely in the interest of the participants and beneficiaries for the exclusive purpose of providing benefits to participants and their beneficiaries, and defraying reasonable expenses of administering the plan, with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims, (b) diversify the investments of the Plan so as to minimize the risk of large losses, and (c) monitor the performance of other fiduciaries to the Plan in a prudent and reasonable manner.

116.    As detailed above, certain of the Defendants also have engaged in and continue to engage in prohibited transactions in violation of ERISA § 406(b)(1), 29 U.S.C. § 1106(b)(1), by dealing with the assets of the Plan in their own interest or for their own account.

117.    As detailed above, certain of the Defendants also have engaged in and continue to engage in prohibited transactions in violation of ERISA § 406(b)(2), 29 U.S.C. § 1106(b)(2), by acting on behalf of third parties which have interests that are adverse to those interests of the

Plan, its participants and/or beneficiaries in connection with transactions involving the Plan.

118.    As detailed above, certain of the Defendants have engaged in and continue to engage in prohibited transactions, in violation of ERISA § 406(b)(3), 29 U.S.C. § 1106(b)(3), by receiving consideration for their own personal accounts from parties such as mutual funds that are dealing with the Plan in connection with transactions (*i.e.*, the purchase and sale of mutual fund shares) involving the assets of the Plan.

119.    The Advisory Committee and the Compensation Committee, respectively, have breached their fiduciary duties to the Plan by failing to adequately and prudently monitor the performance of other fiduciaries of the Plan in the performance of their duties.

120.    Pursuant to ERISA §§ 409 and 502, 29 U.S.C. §§ 1109 and 1132, Defendants are liable to the Plan to credit back, disgorge and/or make restitution of all improper compensation received by them and are liable to the Plan to pay damages or make restitution to the Plan with respect to the losses suffered by the Plan.

121.    Plaintiffs, on behalf of the Plan, are entitled to all equitable or remedial relief as the Court may deem appropriate and just.

122.    Pursuant to ERISA § 502, 29 U.S.C. § 1132, Plaintiffs seek an Order declaring that the above-described practices of Defendants violate ERISA, as set forth above, and seek a permanent injunction preventing Defendants from engaging in such conduct in the future.

## COUNT II
### (For Breach Of Fiduciary Duty)

123.    Plaintiffs incorporate the allegations in the previous paragraphs of this Complaint as if fully set forth herein.

124.    Defendants' conduct, as set forth above, violates their fiduciary duties under ERISA § 404(a)(1)(A) and (B), 29 U.S.C. § 1104(a)(1)(A),(B) and (C), in that Defendants failed and continue to fail to discharge their duties with respect to the Plan solely in the interest of the Plan's participants and beneficiaries and (a) for the exclusive purpose of (i) providing benefits to participants and their beneficiaries; and (ii) defraying reasonable expenses of administering the Plan with (b) the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims, and/or (c) by failing to diversify the investments of the Plan so as to minimize the risk of large losses.  In addition, as set forth above, the Advisory Committee and the Compensation Committee violated their respective fiduciary duties under ERISA to monitor other fiduciaries of the Plan in the performance of their duties.

125.    As a direct result of Defendants' breaches of duties, the Plan has suffered losses and damages.

126.    Pursuant to ERISA § 409, 29 U.S.C. § 1109, and ERISA § 502, Defendants are liable to restore to the Plan the losses that have been suffered as a direct result of Defendants' breaches of fiduciary duty and are liable for damages and any other available equitable or remedial relief, including prospective injunctive and declaratory relief, and attorneys' fees, costs and other recoverable expenses of litigation.

## COUNT III
### (For Co-Fiduciary Breach And Liability For Knowing Breach Of Trust)

127.    Plaintiffs incorporate the allegations in the previous paragraphs of this Complaint as if fully set forth herein.

128.    In the alternative, to the extent that any of the Defendants is not deemed a fiduciary or co-fiduciary under ERISA, each such Defendant is liable to the Plan for all recoverable damages and relief as a non-fiduciary that knowingly participated in a breach of trust.

WHEREFORE, Plaintiffs, on behalf of themselves and the Plan, demand judgment against Defendants, for the following relief:

(a)    Declaratory and injunctive relief pursuant to ERISA § 502, 29 U.S.C. § 1132, as detailed above;

(b)    Disgorgement, restitution and/or damages as set forth above, plus all other equitable or remedial relief as the Court may deem appropriate pursuant to ERISA §§ 409 and 502, 29 U.S.C. §§ 1109 and 1132;

(c)    Pre-judgment and post-judgment interest at the maximum permissible rates, whether at law or in equity;

(d)    Attorneys' fees, costs and other recoverable expenses of litigation; and

(e)    Such further and additional relief to which Plaintiffs and the Plan may be justly entitled and the Court deems appropriate and just under all of the circumstances.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand trial by jury as to all claims so triable.

## NOTICE PURSUANT TO ERISA § 502(h)

To ensure compliance with the requirements of ERISA § 502(h), 29 U.S.C. § 1132(h), the undersigned hereby affirms that, on this date, a true and correct copy of this Complaint was served upon the Secretary of Labor and the Secretary of the Treasury by certified mail, return receipt requested.

Dated: September 1, 2017

Respectfully submitted,

SHEPHERD, FINKELMAN, MILLER
  & SHAH, LLP

/s/ Laurie Rubinow (LR 6637)
James E. Miller
Laurie Rubinow
65 Main Street
Chester, CT 06412
Telephone: (860) 526-1100
Facsimile:  (866) 300-7367
Email: jmiller@sfmslaw.com
        lrubinow@sfmslaw.com

Ronald S. Kravitz
Kolin C. Tang
SHEPHERD, FINKELMAN, MILLER
  & SHAH, LLP
44 Montgomery Street, Suite 650
San Francisco, CA 94111
Telephone: (415) 429-5272
Facsimile:  (866) 300-7367
Email: rkravitz@sfmslaw.com
        ktang@sfmslaw.com

Chiharu G. Sekino
SHEPHERD, FINKELMAN, MILLER
  & SHAH, LLP
401 West A Street, Suite 2550
San Diego, CA 92101
Telephone: 619-235-2416
Facsimile:  (866) 300-7367
Email: csekino@sfmslaw.com

Monique Olivier
DUCKWORTH PETERS LEBOWITZ
  OLIVIER, LLP
100 Bush Street, Suite 1800
San Francisco, CA  94104
Telephone: (415) 433-0333
Facsimile:  (415) 449-6556
Email: monique@dplolaw.com

***Attorneys for Plaintiffs***