**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

**MICHAEL L. FERGUSON, MYRL C. JEFFCOAT and DEBORAH SMITH, on behalf of the DST SYSTEMS, INC. 401(K) PROFIT SHARING PLAN,**

$\qquad$ **Plaintiffs,**

-against-

**RUANE CUNNIFF & GOLDFARB INC., DST SYSTEMS, INC., THE ADVISORY COMMITTEE OF THE DST SYSTEMS, INC. 401(K) PROFIT SHARING PLAN and THE COMPENSATION COMMITTEE OF THE BOARD OF DIRECTORS OF DST SYSTEMS, INC.,**

$\qquad$ **Defendants.**

---

**17-cv-6685 (ALC)**

**ORDER & OPINION**

**ANDREW L. CARTER, JR., United States District Judge:**

## BACKGROUND

Plaintiffs Michael L. Ferguson, Myrl C. Jeffcoat, and Deborah Smith, individually and on behalf of the DST Systems, Inc. 401(k) Profit Sharing Plan, bring this action under 29 U.S.C. §1132 against Defendants DST Systems, Inc ("DST"), the Advisory Committee of the DST Systems, Inc. 401(k) Profit Sharing Plan (the "Advisory Committee"), the Compensation Committee of the Board of Directors of DST (the "Compensation Committee") (collectively "DST Defendants") and Ruane Cunniff & Goldfarb Inc. ("RCG") (collectively with DST Defendants, "Defendants") for breach of fiduciary duties and other violations of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001, *et seq*. DST Defendants now Move to Partially Dismiss Plaintiffs' Second Amended Complaint ("SAC"). For the following reasons, DST Defendants' motion is GRANTED.

## I.     Factual Background[1]

### A. The Parties and The Plan

DST is a global provider of technology-based information processing and servicing solutions. DST offers its employees the opportunity to participate in the DST Systems, Inc. 401(k) Profit Sharing Plan (the "Plan") — a vehicle for retirement savings designated to produce retirement income for its participants. SAC ¶ 12. Plaintiffs are Plan Participants. *Id.* at ¶¶ 9-11.

The Plan is a defined-contribution retirement plan, funded through employee- directed contributions, DST matching contributions, and DST's voluntary profit-sharing contributions. SAC ¶¶ 4,12. The Plan was originally composed of two components: 1) a Profit Sharing Account ("PSA"), in which DST made contributions on behalf of employees and delegated investment management responsibilities to RCG; and 2) a 401(k) participant-directed portion of the Plan, where participants allocate the employee and employer matching contributions into any investment option available under the Plan as determined by the Advisory Committee ("401(k) portion of the plan"). *Id.* at ¶¶ 4 n.1, 22-23, 27.

DST is the Plan's sponsor, administrator, and a designated fiduciary. SAC ¶14. The Advisory Committee and Compensation Committee are named fiduciaries under the Plan, and DST administered the Plan through the Compensation and Advisory Committees. *Id.* at ¶¶14-16, 18. In addition to their overall management responsibilities to the PSA portion of the Plan, the

[1] The following facts derive from Plaintiff's Second Amended Complaint (ECF No.82) and are presumed true. Additionally, on a motion to dismiss, the Court may consider "documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007); *see also Guo v. IBM 401(k) Plus Plan*, 95 F. Supp. 3d 512, 522 (S.D.N.Y. 2015) (taking judicial notice of various ERISA plan-related documents relied on in bringing the action). The Court will take judicial notice of the copies of the relevant documents concerning the Plan, public filings, and required fee disclosures provided to participants of the Plan DST Defendants submitted along with the Declaration of Michael S. Hines (cited as "Hines Decl. Ex"). *See* ECF No. 88.

DST Defendants were also responsible for the administration and management of the 401(k) portion of the Plan, including the selection, monitoring, and retention of the participant-directed investment options. *Id.* at ¶¶ 18, 56.

The Plan's investment options reflected a variety of investment strategies and risk-return profiles. *See* Hines Decl. Exs. 2-5. The management fees charged by those options varied as well. *Id.* In addition to mutual funds, until approximately October 2014 the 401(k) portion of the Plan allowed participants to invest in DST common stock through the DST Stock Fund. SAC. ¶¶ 22, 62. The DST Stock Fund was comprised of 98% to 99% of DST stock and 1% to 2% of cash for liquidity purposes. *See* 2013 SPD at 10; Hines Decl. Ex. 1. For example, the 401(k) portion of the Plan contained the BMO Prime Money Market Fund, a Plan investment managed by an affiliate of the Trustee of the Plan, BMO Harris Bank, N.A. ("BMO"). SAC ¶ 63.

## B. Plaintiffs' Allegations Concerning the PSA Portion of the Plan

With respect to the PSA portion of the Plan, Plaintiffs allege, *inter alia*, that RCG breached its fiduciary duties under ERISA by concentrating an enormous and imprudent amount of the Plan assets in the Valeant Pharmaceuticals International Inc. stock ("VRX"), which caused the Plan to suffer over $100 million in losses when VRX's share price declined in 2015. SAC ¶¶ 5, 24-50. As Plan fiduciaries, the DST Defendants had a duty to monitor RCG, and thus breached that duty by both failing to protect the Plan from RCG's imprudent investment strategy and even supporting RCG when its strategy imploded. *Id.* at ¶¶ 51-53, 55. According to Plaintiff,

3

the DST Defendants engaged in such nonfeasance and malfeasance to preserve its longstanding financial relationship with RCG.[2] *Id.* at ¶¶ 35-40.

## C. Defendants' Alleged Mismanagement of the 401(k) Portion of the Plan

Additionally, Plaintiffs claim the DST Defendants mismanaged the 401(k) portion of the Plan. Although the DST Defendants made RCG responsible for the PSA portion of the Plan, they failed to engage any investment advisors for the 401(k) portion from 2010 until 2015, when the VRX's stock price declined. SAC ¶ 57. Plaintiffs also contend that DST failed to create an ordered process and the Advisory Committee lacked the requisite knowledge and expertise to perform their duties, which the Compensation Committee failed to guard against. *Id.* at ¶ 58. Moreover, Plaintiffs contend the Advisory Committee did not consider adopting a Charter to govern its conduct until 2015. *Id.*

Specifically, Plaintiffs allege that DST Defendants' mismanaged the Plan by: (1) failing to use the least expensive share class of the investment options they chose for the Plan participants and charging participants excessive individual participant fees[3]; (2) offering Plan participants poor-performing and unjustifiably expensive investment options and failing to remove these poor-performing and unjustifiably expensive investment options; (3) failing to offer a stable value investment option, which would have provided participants a guaranteed return of at least 3% per annum; (4) retaining a Company Stock Fund that failed to effectively track the DST's stock; and, (5) failing to engage an investment adviser or otherwise possess the

---

[2] DST is the registrar and shareholder servicing agent for RCG's flagship investment fund. SAC ¶¶ 35-40. As such, Plaintiffs also assert breach of fiduciary duty claims under ERISA against the DST Defendants, as well as ERISA prohibited transaction claims against the DST Defendants and RCG. *Id.* at ¶¶ 94-109. These allegations appear to only be associated with the PSA portion of the Plan and, thus, are not the subject of this motion to dismiss.

[3] Plaintiffs also claim Defendants failed to conduct a competitive bidding process for its recordkeeper, causing Plaintiffs to pay unreasonable recordkeeping fees.

requisite qualifications to manage the Plan. *Id.* ¶¶ 57-67, 74, 76-77, 81-83. These actions, or inactions, allegedly caused Plaintiffs to lose millions of dollars. *Id.* at ¶¶ 84, 86-87, 94-109.

## II.    Procedural Background

Plaintiffs filed their Original Complaint on September 1, 2017, an Amended Complaint on November 20, 2017 and the SAC on November 5, 2018. ECF Nos. 1, 9, 82. On December 14, 2018, DST Defendants moved to partially dismiss the SAC, arguing that, "[a]ll of Plaintiffs' allegations and claims concerning the 401(k) portion of the Plan fail to state a claim as a matter of law." ECF Nos. 86-87; Def.'s Mem. 2. DST Defendants also filed multiple exhibits to support their motion.[4] ECF No. 88. Plaintiffs filed their Opposition on December 26, 2018 and DST Defendants replied on January 10, 2019. ECF Nos. 90-91. The Court considers this motion fully briefed.

## LEGAL STANDARD

### A.    Motions to Dismiss

To survive a motion to dismiss pursuant to Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). *See also* Fed. R. Civ. P. 8(a)(2) ("A pleading that states a claim for relief must contain ... a short and plain statement of the claim showing that the pleader is entitled to relief...."). A claim is facially plausible "when

---

[4] DST Defendants submitted the following Attachments: # 1 Exhibit 1 2013 Summary Plan Description for the DST Systems, Inc. 401 (k) Profit Sharing Plan, # 2 Exhibit 2 December 31, 2012 Participant Fee Disclosure Notice, # 3 Exhibit 3 - March 1, 2014 Participant Fee Disclosure Notice, # 4 Exhibit 4 March 6, 2015 Participant Fee Disclosure Notice, # 5 Exhibit 5 March 25, 2016 Participant Fee Disclosure Notice, # 6 Exhibit 6 April 10, 2017 American Century Value Fund Prospectus, # 7 Exhibit 7 April 10, 2017 American Century Growth Fund Prospectus, # 8 Exhibit 8 April 10, 2017 American Century Select Fund Prospectus, # 9 Exhibit 9 April 10, 2017 American Century Ultra Fund Prospectus, # 10 Exhibit 10 March 2015 Lord Abbett Affiliated Fund Prospectus). *Id.* The Court will take judicial notice of these documents. However, these documents may only be considered for the fact that they contain a statement therein, not to prove the truth of the statement. *See Staehr v. Hartford Fin. Servs. Grp., Inc.*, 547 F.3d 406, 425 (2d Cir. 2008).

the plaintiff pleads factual content that allows the Court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 556, 127 S.Ct. 1955). The plaintiff must allege sufficient facts to show "more than a sheer possibility that a defendant has acted unlawfully," and accordingly, where the plaintiff alleges facts that are "'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'" *Id.*

As previously stated, courts must accept as true all factual allegations in the complaint and draw all reasonable inferences in plaintiff's favor. *ATSI Commc'ns. Inc. v. Shaar Fund Ltd.*, 493 F.3d 87, 98. However, that tenet "is inapplicable to legal conclusions." *Iqbal*, 556 U.S. at 678. Thus, a pleading that offers only "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555. If the plaintiff "ha[s] not nudged [its] claims across the line from conceivable to plausible, [his] complaint must be dismissed." *Id.* at 570.

### B. ERISA Pleading Standards

The Supreme Court has acknowledged that Rule 12(b)(6) is an important mechanism for weeding out meritless claims in the ERISA context. *Fifth Third Bancorp v. Dudenhoeffer,* 134 S. Ct. 2459, 2471 (2014). The Second Circuit has also cautioned that courts should take "particular care" in applying *Twombly* and *Iqbal* pleading standards in the context of ERISA claims. *Pension Ben. Guar. Corp. ex rel. St. Vincent Catholic Med. Ctrs. Ret. Plan v. Morgan Stanley Inv. Mgmt. Inc.*, 712 F.3d 705, 718 (2d Cir. 2013) (internal quotation marks omitted) ("*Morgan Stanley*"). The Second Circuit reasoned that "a suit claiming breach of fiduciary duty is ominous," thus "elevat[ing] the possibility that a plaintiff with a largely groundless claim [will] simply take up the time of a number of other people, with the right to do so representing an in terrorem increment of the settlement value." *Id.* at 719 (internal quotation marks omitted). Furthermore, although details

about a fiduciary's methods and actual knowledge tend to be "in the sole possession of [that fiduciary]," ERISA imposes extensive disclosure requirements on plan administrators, thus giving plan beneficiaries and participants the opportunity to find out how the fiduciary invested the plan's assets. *Id.* (quoting *Braden v. Wal-Mart Stores, Inc.,* 588 F.3d 585, 598 (8th Cir. 2009)).

Despite their "ominous" nature, the Second Circuit declared that ERISA breach of fiduciary claims may not have to be pleaded with the traditional *Twombly* and *Iqbal* levels of specificity. *See Id.* at 718. As discussed in further detail below, plaintiffs bringing ERISA breach of fiduciary duty claims must allege facts focusing on a flawed process rather than unfavorable results. *See In re Citigroup ERISA Litig.,* 662 F.3d 128, 140 (2d Cir.2011). However, in *Morgan Stanley* the Second Circuit pointed out that even when a plaintiff does not directly address the process by which an ERISA plan was managed, a breach of fiduciary duty claim may survive a motion to dismiss if the court, based on circumstantial factual allegations, may reasonably infer the process was flawed. *Id.*[5] Furthermore, such claims will survive if the complaint alleges facts showing an adequate investigation would have revealed to a reasonable fiduciary that the decision at issue was imprudent. *Morgan Stanley,* 712 F.3d at 718. Essentially, if a complaint relies on circumstantial factual allegations to show a breach of fiduciary duties under ERISA, those allegations must give rise to a reasonable inference that the defendant committed the alleged misconduct, thus permitting the court to infer more than the mere possibility of misconduct. *Id.*

Against this backdrop, Plaintiffs' ERISA claims require the Court to take particular care in applying *Twombly* and *Iqbal* to ensure that the SAC alleges *nonconclusory* facts that raise

---

[5] *See also* Employee Retirement Income Security Act of 1974, § 3(21), 29 U.S.C.A. § 1002(21).

a *plausible* inference of misconduct and does not rely on "the vantage point of hindsight." *Id.* at 718 (quoting *In re Citigroup.,* 662 F.3d at 140).

## DISCUSSION

### I.     ERISA Fiduciary Duties

To state a claim for breach of fiduciary duty under ERISA, a complaint must allege that (1) the defendant was a fiduciary who (2) was acting in a fiduciary capacity, and (3) breached his fiduciary duty. 29 U.S.C. § 1109. "ERISA's central purpose is to protect beneficiaries of employee benefits plans." *In re Citigroup*, 662 F.3d at 135 (internal quotation marks omitted). In pursuit of this goal, ERISA specifically charges fiduciaries with multiple distinct but interrelated duties.

The parties do not dispute that DST Defendants were fiduciaries acting in their capacity while administering the 401(k) portion of the Plan. In Counts I and II, Plaintiffs allege breaches of the duties of both loyalty and prudence. The Court will address each breach of duty claim separately.

### II.     Breach of Duty of Loyalty Claims

Plaintiffs fail to state a claim that DST Defendants breached its duty of loyalty. ERISA's duty of loyalty arises under ERISA § 404(a)(1)(A), and charges fiduciaries with acting "for the exclusive purpose of . . . providing benefits to participants and their beneficiaries[] and . . . defraying reasonable expenses." 29 U.S.C. § 1104(a)(1)(A). To state a claim for breach of the duty of loyalty, a plaintiff must do more than allege that a defendant failed to act for the exclusive purpose of providing benefits to participants. Rather, a plaintiff must allege plausible facts supporting an inference that the defendant acted *for the purpose* of providing benefits to itself or someone else. *See In re DeRogatis*, 904 F.3d 174, 191 (2d Cir. 2018); *O'Day v. Chatila*, 774 F. App'x 708 (2d Cir. 2019); *Sacerdote v. New York Univ.,* No. 16-cv-6284 (KBF), 2017 WL 3701482, at *5-6 (S.D.N.Y. Aug. 25, 2017) ("*Sacerdote I*") (dismissing duty of loyalty claim because the complaint contained

"no factual allegations [to] support purposeful action by [the defendant] to benefit another (let alone itself")).[6]

Here, Plaintiffs' SAC lacks sufficient factual allegations to state a claim that DST Defendants breached their of the duty of loyalty. Plaintiffs' conclusory claims concerning the 401(k) portion of the Plan are devoid of factual allegations supporting *purposeful* action by the DST Defendants to benefit themselves or a third-party. *See*, e.g., SAC. ¶¶ 56-77. Instead, these allegations merely ride the coattails of Plaintiffs' duty-of-prudence allegations and are insufficient to state a breach of loyalty claim. *See Cunningham v. Cornell Univ.*, No. 16-cv-6525 (PKC), 2017 WL 4358769, at *4 (S.D.N.Y. Sept. 29, 2017) ("Because these claims do not support an inference that defendants' actions were for the purpose of providing benefits to themselves or someone else and did not simply have that incidental effect, the loyalty claims ... are dismissed.").[7] Thus, Plaintiffs' loyalty claims are impermissibly intertwined with their prudence claims, and there are no separate allegations purporting to support them. Accordingly, Plaintiffs' loyalty claims based on the 401(k) portion of the Plan in Counts I and II are dismissed.

### III. Breach of Duty of Prudence Claims

ERISA § 404(a)(1)(B) requires fiduciaries to act "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use." 29 U.S.C. § 1104(a)(1)(B). Courts determine whether a fiduciary

---

[6] *See also White v. Chevron Corp.*, No. 16-cv-0793-PJH, 2016 WL 4502808, at *5 (N.D. Cal. Aug. 29, 2016) (dismissing duty of loyalty claim on a Rule 12(b)(6) motion because "the complaint pleads no facts sufficient to raise a plausible inference that defendants took any of the actions alleged for the purpose of benefitting themselves or a third-party").
[7] *See also Cassell v. Vanderbilt Univ.*, 285 F.Supp.3d 1056, 1062-63 (M.D. Tenn. 2018) ("Plaintiffs' loyalty claims are characterizations that piggy back off their prudence claims. The facts alleged in the Amended Complaint assert that Defendants ... engaged in self-dealing or acted for the purpose of benefitting a third party. Any facts that remotely relate to a duty of loyalty are insufficient to state a claim.")); *Short v. Brown Univ.*, 320 F. Supp. 3d 363, 368 (D.R.I. 2018)

acted with the requisite care "according to the objective prudent person standard developed in the common law of trusts." *Chao v. Merino*, 452 F.3d 174, 182 (2d Cir. 2006). "[U]nder trust law, a fiduciary normally has a continuing duty of some kind to monitor investments and remove imprudent ones." *Tibble v. Edison Int'l*, 135 S. Ct. 1823, 1828-29, 191 L. Ed. 2d 795 (2015); *see also Moreno v. Deutsche Bank Ams. Holding Corp.*, 2016 U.S. Dist. LEXIS 142601, at *16 (S.D.N.Y. Oct. 13, 2016).

A claim of imprudence requires an analysis of a "fiduciary's conduct in arriving at an investment decision, not on its results, and ask[s] whether a fiduciary employed the appropriate methods to investigate and determine the merits of a particular investment." *Morgan Stanley*, 712 F.3d at 716. In other words, courts analyze a fiduciary's *process* to determine prudence, not outcome. As mentioned above, where a plaintiff fails to allege facts about a defendant fiduciary's decision-making process, the claim may survive only if there are enough circumstantial factual allegations to allow the court to reasonably infer the process was flawed. *Id.* at 718 (internal quotation marks omitted). Therefore, a plaintiff must show, through reasonable inferences from well-pleaded facts, that the fiduciary's choices did not meet ERISA requirements. As noted, for a plaintiff relying on inferences from circumstantial allegations, this standard generally requires the plaintiff to allege facts, accepted as true, showing that a prudent fiduciary in like circumstances would have acted differently.

Generally, with respect to the 401(k) portion of the Plan, Plaintiffs claim that DST Defendants breached their fiduciary duties by failing to monitor the fees charged directly and indirectly to the Plan and its participants, and by failing to ensure that such fees were fair and reasonable. SAC ¶ 71. Specifically, Plaintiffs claim DST Defendants' breached their duty of prudence by: (1) charging participants "excessive" investment management and individual participant fees (*id.* ¶¶ 56, 59, 60,

61, 62, 64); (2) maintaining Plan investment options that performed poorly (*id.* ¶¶ 65-66); (3) not considering alternative investment vehicles (e.g., *id.* ¶¶ 64, 81); (4) failing to adequately monitor the Stock Fund (*id.* ¶¶ 74-77); and (5) failing to engage an investment adviser or otherwise possess the requisite qualifications to manage the Plan. *Id.* ¶¶ 57-58. The Court must now determine whether these allegations, taken together, lead to a reasonable inference that DST Defendants' employed a flawed process while administering the Plan. *See Morgan Stanley*, 712 F.3d at 718.

## A. Plan Fees

Plaintiffs allege that (1) certain Plan investments had "excessive" management fees (SAC ¶¶ 56, 59, 60, 61, 64) and (2) participants paid "excessive" individual fees and total Plan costs ("administrative fees") (*id.* ¶¶ 62). The Court must determine if these allegations support an inference that the DST Defendants engaged in a flawed process with respect to the 401(k) portion of the Plan.

### 1. The Investment Management Fees

Plaintiffs allege that the DST Defendants breached ERISA's duty of prudence by including in the Plan "inappropriate and imprudent share classes . . . even though there were alternative, available share classes for which the Plan was eligible, and which would have resulted in significantly lower costs to the Plan for the same exact investments." SAC. ¶ 59. The Plan was comprised of investment options with a range of expense ratios from 4 basis points ("bps") to 129 bps and included both actively managed and passively managed investment products. *See*, e.g., Hines Decl. Ex. 3. To find these investment decisions imprudent, the Court must determine whether Defendants, "at the time of the challenged transaction, employed the appropriate methods to investigate the merits of the investment to structure the investment." *Katsaros v. Cody*, 744 F.2d

270, 279 (2d Cir.1984). *See also Chao,* 452 F.3d at 182 (holding that the prudent person standard does not require the fiduciary to take any particular course of action even if another approach seems preferable). Plaintiffs do not allege that including higher-cost share classes of certain investment options rendered the Plan's portfolio building process imprudent. Instead, Plaintiffs argue certain individual investment options reflect DST Defendants' imprudence. Pl.'s Opp. 12-14. However, the Second Circuit requires courts to consider the Plan's mix of investment options to determine prudence. *See Morgan Stanley,* 712 F.3d at 717; *Sacerdote I,* 2017 WL 3701482, at *11. Thus, Plaintiffs' share-class allegations fall short.

The *Sacerdote I* court held identical allegations—that lower-cost share classes were available—were insufficient to support a breach of fiduciary duty under ERISA. 2017 WL 3701482, at *11. There, plaintiffs alleged that defendants breached ERISA fiduciary duties by offering expensive and imprudent investment options in its retirement plan and including high-cost share classes though cheaper alternatives were available. *Id.* The District Court dismissed these allegations,[8] reasoning that allegations of lower-cost share classes did "not constitute evidence of imprudence" because "prudent fiduciaries may very well choose to offer retail share class shares over institutional class shares . . . because retail class shares necessarily offer higher liquidity." *Id.* Essentially, the court rejected plaintiffs' share-class allegations because the investment management fees associated with all the plan's investment options were reasonable. *Id.*[9]

---

[8] The *Sacerdote I* court also observed that the Third, Seventh, and Ninth Circuits rejected similar allegations in circumstances where the mix and range of all of the available investment options were reasonable. *Id.* (citing *Tibble v. Edison Int'l,* 729 F.3d 1110 (9th Cir. 2013); *Renfro v. Unisys Corp.,* 671 F.3d 314 (3d Cir. 2012); *Loomis v. Exelon Corp.,* 658 F.3d 667 (7th Cir. 2009)).

[9] *See also Davis v. Wash. Univ. in St. Louis,* No. 4:17-cv-1641-RLW, 2018 WL 4684244, at *2 (E.D. Mo. Sept. 28, 2018) (dismissing ERISA breach of fiduciary claims based on allegations that the plan "offered [] retail share classes for which identical, cheaper shares were available"); *Sweda v. Univ. of Penn.,* No. 16-4329, 2017 WL 4179752, at *9 (E.D. Penn. Sept. 21, 2017) (dismissing identical allegations as insufficient where half of the plan's investment options also included lower-cost institutional offerings); *White,* 2017 WL 2352137, at *14 ("merely alleging that a [p]lan offers [certain share classes] is insufficient to state a claim for breach of the duty of prudence, as fiduciaries have latitude to value investment features other than price, and indeed are required to do so"), aff'd, -- F. App'x --, No. 17-16208, 2018

In a subsequent Motion for Reconsideration, the District Court held that share class allegations are insufficient as a matter of law to a state a claim for breach of fiduciary duty absent well-pleaded allegations that the range of options in the Plan "were imprudent *because of the inclusion*" of higher-cost share classes. *Sacerdote v. New York Univ.*, No. 16-cv-6284 (KBF), 2017 WL 4736740, at *3 (S.D.N.Y. Oct. 19, 2017) ("*Sacerdote II*"). In *Sacerdote II*, the court denied plaintiffs' motion to reconsider her dismissal of their share class allegations, holding that *Morgan Stanley* declared that the "'prudence of *each* investment is not assessed in isolation but, rather, *as the investment relates to the portfolio as a whole*.'" *Sacerdote II*, 2017 WL 4736740 at *1 (quoting *Morgan Stanley*, 712 F.3d at 717). Thus, "[w]here plaintiffs allege that a defendant breached its fiduciary duty by including [higher-cost] class shares but do not sufficiently allege an alteration of the total mix, the allegation does not survive a motion to dismiss." *Sacerdote II*, 2017 WL 4736740 *at* *2. To find these investment decisions imprudent, the court pointed out, "[the] retail class shares would have to be so prevalent that an entire Plan was tainted. To hold otherwise would result in an unreasonable level of micromanagement of investment mixes by courts and unduly restrict fiduciaries." *Id.*

Similarly, here, the SAC identifies twelve (of the twenty-nine) investment options with lower-cost share classes that utilize a more expensive share class in the Plan lineup. *Id.* However, Plaintiffs' allegations that the Plan included high-cost share classes of investment options when lower-cost share classes of those same investment options were available to the Plan do not, as a matter of law, support an inference of a flawed fiduciary process. *Sacerdote I,* 2017 WL 3701482, at *11. Furthermore, the Plan was comprised of a reasonable range of investment options. *See Rosen v. Prudential Ret. Ins. & Annuity Co.*, No. 3:15-cv-1839 (VAB), 2016 WL 7494320, at *15

---

WL 5919670, at *1 (9th Cir. Nov. 13, 2018); *White*, 2016 WL 4502808, at *11 (dismissing claims and holding that share-class allegations were "based on the [incorrect] assumption that the mere inclusion of a fund with an expense ratio that is higher than that of the lowest share class violates the duty of prudence").

(observing that the plan's investment options had expense ratios ranging from 4 bps to 102 bps and holding that the "inclusion of . . . lower-cost alternatives undermines [p]laintiffs' assertions that [defendants] breached their fiduciary duties by charging excessive fees"), aff'd, 718 Fed. App'x 3 (2d Cir. 2017). Accordingly, Plaintiffs' share-class allegations, standing alone, do not allow the Court to reasonably find imprudence.

Plaintiffs also allege that DST Defendants' decisions related to the BMO Prime Money Market Fund were imprudent because the fund had "an extremely high expense ratio of 46 bps" and offered a lower-cost share class. SAC. ¶ 64. However, that fund is not an investment option into which participants can place their money (i.e., a designated investment alternative), and therefore was not available for Plan participants to invest in. Each of the Plan's Participant Fee Disclosure Notices "details information required to be provided . . . on an annual basis for each of the [P]lan's designated investment alternatives." *See generally* Hines Decl. Exs. 2-5. The BMO Prime Money Market Fund is not listed as an option for participants to make contributions.[10] Accordingly, DST Defendants' failure to include BMO Prime Money Market Fund's lower-cost share class is not circumstantial proof of imprudence.

In sum, Plaintiffs' SAC only alleges that DST Defendants breached its duty of prudence by failing to include more affordable share classes within the Plan. However, there are many reasons to select certain share classes. Considering that it would be improper for the Court to "micromanage" fiduciary investment choices, Plaintiffs were required to allege that DST Defendants' share class selection process was flawed or that certain investments tainted the entire Plan. *Sacerdote II*, 2017 WL 4736740 *at* *2. Plaintiffs did not. Therefore, Plaintiffs failed to sufficiently allege that DST

---

[10] The BMO Prime Money Market Fund was a cash account to hold the Plan's cash and accounted for as an administrative expense, which are not charged to plan participants (*see supra*, at 14-15)).

14

Defendants breached their duty of prudence with respect to the 401(k) portion of the Plan's investment management fees.

## 2. Administrative Fees and Record Keeping

In addition to alleged excessive investment management fees, the SAC alleges that the Plan paid an unreasonable amount of administrative fees. *See* SAC. ¶ 62. Specifically, Plaintiffs allege that: (1) participants paid "significant and excessive individual participant fees that range from 29-35 basis points, which result in a total cost to participants of approximately 150 bps" (*id.*), and (2) the Plan's fiduciaries failed to solicit bids from alternative service providers. *Id.* at ¶ 82. DST Defendants argue these claims are "wrong" and "vague" because the Plan's March 25, 2016 fee disclosure notice states that participants were not charged recordkeeping fees and other administrative expenses. Def.'s Mem.13; *see also* Hines Decl. Ex. 5. Considering Plaintiffs were not charged administrative expenses, Defendants' argue, Plaintiffs fail to identify what individual fees they seek to challenge.

For the purposes of this motion, the Court must take Plaintiffs' "factual allegations to be true and draw[] all reasonable inferences in the plaintiffs favor." *Iqbal*, 556 U.S. 678. Moreover, the disclosure notice "may only be considered for the fact that they contain a statement therein but not to prove the truth of the statement." *Cunningham,* 2017 WL 4358769, at *4. Therefore, the Court accepts Plaintiffs' allegation that they were charged administration fees. However, like the share-class analysis, paying higher-fees alone does not allow the Court to conclude that the fees were "excessive" enough to prove DST Defendants' imprudence.

The DST Defendants also argue that Plaintiffs' excessive administration fees claim is insufficient because Plaintiffs do not provide a benchmark. Def.'s Memo. 14. Plaintiffs contend

that the SAC states that the Plan's total plan cost is excessive as compared with other plans of similar market power. SAC ¶ 62. Indeed, the SAC makes the assertion. However, it does nothing more.

Plaintiffs improperly rely on *Vellali v. Yale Univ.*, 308 F. Supp. 3d 673 (D. Conn. 2018). In *Vellali*, the court found that the plaintiffs sufficiently alleged that plan fiduciaries breached their duty of prudence based on the plan's alleged excessive administrative fees. *Id.* at 685. Specifically, the plaintiff participants alleged that the cost of recordkeeping under the plan swelled out of proportion to actual recordkeeping services provided and that the fiduciaries' decision-making process was deficient in terms of monitoring, soliciting competitive bids, negotiating, and selecting reasonably priced recordkeepers. *Id.* The court declared these allegations sufficient because plaintiffs' complaint compared the general range of costs for a flat fee arrangement to estimates of the cost for the plan's recordkeeping arrangement, highlighted the competition among third-party recordkeepers, and quoted the advice of industry experts who recommended consolidation. *Id.*

Unlike the plaintiffs in *Vellali*, Plaintiffs fail to allege that the administrative "fees were excessive relative to the services rendered." *Id.* (quoting *Young v. G.M Inv. Mgmt. Corp.*, 325 F. App'x 33 (2d Cir. 2009)). Furthermore, Plaintiffs have not alleged a benchmark to compare the 29-35 basis points alleged in the SAC. *See* Opp. at 17-19. Plaintiffs allegation that "[b]ased upon its market power, the Plan should have been required to pay less than 50% of the total TPC that the DST Defendants consistently permitted the Plan to be assessed," is a conclusion, not a benchmark. *See* SAC ¶ 62.[11] Plaintiff did not compare the Plan's record keeping service to an alternative a

---

[11] *See also White*, 2016 WL 4502808, at *5. Similar to Plaintiffs, the plaintiffs in *White* merely provided a "conclusory assertion that fees under a revenue-sharing arrangement are necessarily excessive and unreasonable." *Id.* at *14.

prudent fiduciary would have selected or provide any additional facts to support their assertion that the administrative fees were excessive.

Plaintiffs' "competitive bidding" argument fails as well. Though Plaintiffs' allegation that the DST Defendants did not seek competitive bids for Plan services (*id.* ¶ 82) is factual, it alone fails to "give rise to a *reasonable* inference" of imprudence. Unlike the plaintiffs in *Vellali*, Plaintiffs offer no support for this claim. The SAC lacks additional factual allegations demonstrating how the Plan's recordkeeping service was not competitive or facts suggesting DST Defendants' did not conduct a competitive bidding process. The Court cannot draw such a conclusion based solely on Plaintiffs' assertion that the Plan's recordkeeping fees were unreasonable. Moreover, ERISA does not require plan fiduciaries to obtain competitive bids from plan service providers. Thus, DST Defendants' alleged failure to seek competitive bids is "merely consistent with a finding of [imprudence]," as opposed to being "suggestive" of such a finding. *Morgan Stanley* 712 F.3d at 718-19 (internal quotation marks and citation omitted).[12]

Therefore, by relying solely on conclusory claims, the SAC fails to sufficiently allege that the Plan's administration fees reflect DST Defendants' misconduct. Accordingly, the Court does not consider the allegations related to the administrative fees as circumstantial factual allegations suggesting that the DST Defendants breached their duty of prudence.

**B. Poorly Performing Investment Options**

Plaintiffs allege that eight of the Plan's investment options "consistently underperformed" their one-, three-, and ten-year benchmarks between 2009 and 2016 (SAC. ¶ 66), and that "certain," but

---

[12] Indeed, the *White* court rejected an identical allegation, holding that such an allegation "has no legal foundation" particularly where—as here—plaintiffs failed to allege any facts "showing that the [p]lan fiduciaries failed to consider putting the fee structure out for competitive bidding, or failed to negotiate a reasonable fee structure with [the plan's recordkeeper]." *White*, 2016 WL 4502808, at *14-15.

unidentified, investment options "were poorly rated." *Id.* ¶ 65. As previously stated, under ERISA,

the test for imprudence is one of "conduct in arriving at an investment decision, not on its results."

*Morgan Stanley*, 712 F.3d at 716 (internal quotation marks and citation omitted). A plaintiff "cannot

rely, after the fact, on the magnitude of the decrease in the [relevant investment's] price." *Id.* at 718.

Courts have consistently maintained that the price of an investment does not, by itself, create a

plausible inference that the investment is no longer a prudent. *See, e.g., Gearren v. The McGraw–

Hill Cos.*, 660 F.3d 605, 610 (2d Cir.2011) (an investment in company stock is not imprudent

"'mere[ly]'" because the price "'trend[s] downward significantly'" (quoting *Wright v. Or.

Metallurgical Corp.*, 360 F.3d 1090, 1099 (9th Cir.2004))). Rather, pointing out the price drop only

indicates the fiduciary's expectations were incorrect. This claim, independently, says nothing about

the process in which the fiduciary arrived at such expectations. As previously explained, an

allegation that an investment's price dropped, even precipitously, does not alone suffice to state a

claim under ERISA. *Morgan Stanley,* 712 F.3d at 722*; see also In re Citigroup*, 662 F.3d at 140;

*Summers v. State St. Bank & Trust Co.*, 453 F.3d 404, 408 (7th Cir.2006). Instead, Plaintiffs must

"allege[] facts that, if proved, would show that an adequate investigation would have revealed to a

reasonable fiduciary that the investment at issue was improvident." *Morgan Stanley,* 712 F.3d at

722. (internal quotation marks and citation omitted).[13]

Plaintiffs' correctly point out that, if proven true, DST Defendants continued retention of

underperforming investment options implicates a breach of their "continuing duty of some kind

to monitor investments and remove imprudent ones" that "exists separate and apart from the

trustee's duty to exercise prudence in selecting investments at the outset," *Tibble,* 135 S. Ct. at

---

[13] *See also Sweda*, 2017 WL 4179752, at *10 (dismissing ERISA claim where plaintiff alleged that "60% of the Plan's investment options 'underperformed their respective benchmarks over the previous 5-year period'" because "[a] statistical sampling of funds would expect (all things being equal) half of the funds to be above benchmarks and half to be below benchmarks").

1828-29. However, the performance data shows that the alleged investments did not consistently underperform. Contrary to Plaintiffs contention, the Court may rely on the performance data submitted by the DST Defendants. Plaintiffs allegations concern fund performance, and therefore, the Court may factor in the fund performance data integral to the allegation to decide this motion. *See A.V.E.L.A.,* 2018 WL 1273343, at *8 n.4 ("On a motion to dismiss . . . the Court may also properly consider documents that are incorporated by reference or that are integral to the complaint. . . . [w]here, as here, documents properly considered on a motion to dismiss contradict the pleadings, the Court need not accept those pleadings as true"). The relevant performance data demonstrates that the funds challenged in the SAC did not "consistently underperform" benchmarks, but rather had periods of both outperformance and underperformance common amongst portfolio of investments. *See* Def Memo. at 15-16.[14] Furthermore, Plaintiffs admit that the funds at issue experienced "certain periods of slight outperformance." Therefore, considering the performance data and Plaintiffs' admissions, nothing in the SAC indicates the DST Defendants' breached their duty of prudence by failing to remove the funds at issue.

Moreover, even if the Court were to disregard the performance data and concede that these funds underperformed, Plaintiffs failed to allege facts suggesting a reasonable investor would have avoided them all together. Plaintiffs' allegations that certain investment options underperformed as compared to certain benchmarks do not raise a plausible inference that a prudent fiduciary would

---

[14] For example, as of December 31, 2013: (i) the TIAA-CREF Mid Cap Value Fund had outperformed both its benchmarks on a 5-year and 10-year basis, and outperformed one of its two benchmarks on a one-year basis (*See* March 1, 2014 Participant Fee Disclosure Notice at 4 (Hines Decl. Ex. 3)); (ii) the Fidelity Advisor Growth Opportunities Fund outperformed both of its benchmarks on a one-year and five-year basis, and had outperformed one of its benchmarks on a ten-year-basis (*id.*); (iii)the American Century Ultra Fund had outperformed both of its one-year and one of its five-year benchmarks (*id.*); and (IV)the American Century Growth Fund had outperformed both of its ten-year benchmarks, outperformed one of its five-year benchmarks, and modestly underperformed its one-year benchmarks (while still returning 29.37%) (*id.* at 3). Indeed, each of the eight investment options had periods of outperformance and modest underperformance between 2009 and 2016 (*see generally*, Participant Fee Disclosure Notices (Hines Decl. Exs. 2-5)).

have found those investments to be "so plainly risky" to render them imprudent. *Morgan Stanley*, 712 F.3d at 719; *see also Leber v. Citigroup 401(K) Plan Inv. Comm.*, 129 F. Supp. 3d 4, 15 (S.D.N.Y. 2015); *Iqbal*, 556 U.S. at 678 ("Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." (internal quotation marks omitted)). Nothing in the SAC indicates the existence of a "warning sign" or alarming signal DST Defendants should have been aware of before making these investments. *See Morgan Stanley*, 712 F.3d at 721. Thus, Plaintiffs' underperformance allegations do not indicate a flawed process. *See e.g., Laboy v. Bd. of Trs. of Bldg. Serv. 32 BJ SRSP Fund*, 513 F. Apptx 78, 80 (2d Cir. 2013) (affirming dismissal of ERISA breach of fiduciary duty claims based on alleged high investment management fees and one-, three-, and five-year returns, and holding that "[i]t is well-established that allegations of poor results alone do not constitute allegations sufficient to state a claim for such a breach").

Essentially, Plaintiffs' performance allegations are "not sufficient to create a reasonable inference that plan administrators failed to conduct an adequate investigation—either when the investment was selected or as its underperformance emerged—as ERISA requires plaintiff to plead some other objective indicia of imprudence." *Morgan Stanley*, 712 F.3d at 718-19. Therefore, the Court finds Plaintiffs' poor performance allegations too conclusory to state a plausible claim for relief.

## C. Alternative Investment Vehicle Allegations

Plaintiffs also allege that the DST Defendants acted imprudently by (i) failing "to adequately investigate and offer non-mutual fund alternatives such as collective trusts and separately managed accounts", and (ii) selecting a money market fund rather than a stable value fund. SAC ¶¶ 64, 81. Like their other claims, Plaintiffs suggest that the Court consider these

20

circumstantial factual allegations as pieces of a whole to draw a reasonable inference that DST Defendants' breached their duties. Pl.'s Opp. 23.

The Court finds that Plaintiffs' alternative investment vehicle allegations fail to state a claim both viewed in isolation or alongside their other factual allegations. Plaintiffs fail to show how DST Defendants' decision not to offer non-mutual fund alternatives suggests imprudence. Unlike collective trusts or separately managed accounts, mutual funds are subject to extensive SEC regulation under the Investment Company Act, 15 U.S.C. §§ 80a-1, *et. seq.* Furthermore, mutual funds, *inter alia*, are governed by boards that include independent directors (*see* 15 U.S.C. § 80a-16), are registered with the SEC, and provide detailed shareholder communications such as prospectuses and annual reports. *See* 15 U.S.C. §§ 80a-8, 24, 29. Collective trusts and separate accounts, by contrast, are not subject to SEC regulations and disclosure rules. Considering these benefits, the DST Defendants' decision to offer mutual funds over collective trusts does not appear to be so "plainly risky" to render it imprudent. *Morgan Stanley,* 712 F.3d at 719.

Nevertheless, Plaintiffs contend that the fact that DST Defendants *only* offered mutual funds as opposed to other investment options shows defendants' imprudence. However, ERISA does not require fiduciaries to include a particular mix of investment vehicles in a plan. *See Id.* at 718 (quoting *Hecker v. Deere & Co.,* 556 F.3d 575, 586 (7th Cir.2009))) ("It is clear that 'nothing in ERISA requires every fiduciary to scour the market to find and offer the cheapest possible fund.'" … "We see nothing in [ERISA] that requires plan fiduciaries to include any particular mix of investment vehicles in their plan."). Therefore, the Court concludes that DST Defendants were not

imprudent simply by causing the Plan to opt for the services offered by mutual funds over alternatives, even if mutual funds have higher fees.[15]

Similarly, Plaintiffs' argument that the Plan should have included a stable value fund rather than a money market fund fails. SAC ¶ 64. The SAC does not allege sufficient facts to show DST Defendants breached the duty of prudence by including the money market fund as an investment option. Offering a money market fund as one of a broad array of investment options along the risk/reward spectrum satisfied the DST Defendants' duty of prudence. *See White*, 2016 WL 4502808, at *7-8. Without additional facts that raise an inference of imprudence by selecting the money market fund—apart from the fact that stable value funds may provide a higher return— Plaintiffs SAC fails to state a claim. *Id.*

### D. The DST Stock Fund

Plaintiffs also contend that the DST Defendants' failed to adequately monitor the DST Stock Fund because "it appears" that the fund "underperformed DST's stock performance more than it should have, presumably due to cash drag on the Company Stock Fund." SAC ¶ 76. Essentially, Plaintiffs claim that the DST Defendants improperly managed the DST Stock Fund because it contained both stock and cash. *See* Opp. 24.

Plaintiffs' DST Stock Fund allegations do not suggest a flawed process. For example, the SAC fails to allege how much the DST Stock Fund underperformed DST stock. Instead, it merely states

---

[15] The Court's view is consistent with other federal courts outside the Second Circuit analyzing retirement plan disputes. *See, e.g., Loomis*, 658 F.3d at 671 (affirming dismissal and rejecting claim that fiduciaries should have offered institutional investments rather than retail mutual funds); *see also White*, 2016 WL 4502808, at *12 (rejecting allegation that a failure to offer collective trusts or separate accounts supported an ERISA breach of fiduciary duty claim and holding that "[i]t is inappropriate to compare distinct investment vehicles solely by cost . . . mutual funds have unique regulatory and transparency features, which make any attempt to compare them to investment vehicles such as collective trusts and separate accounts an apples-to-oranges comparison" (internal quotation marks omitted)).

that the fund underperformed DST stock by "more than it should have." SAC. ¶ 76. Plaintiffs' lone allegation about the DST Stock Fund's cash buffer—that it caused the Stock Fund to underperform DST stock (id. ¶ 76) —is insufficient to state a claim for breach of fiduciary duty because a plaintiff "cannot rely, after the fact, on the magnitude of the decrease in the [relevant investment's] price." *Morgan Stanley*, 712 F.3d at 718.

Moreover, blaming the DST Stock Fund's underperformance on the existence of "cash buffers" is too conclusory to draw a reasonable inference of imprudence. As Defendants point out, "cash buffers" in company stock funds are a common practice to provide liquidity in those funds. Def.'s Mem. 19; *see also , e.g.*, *George v. Kraft Foods Global, Inc.*, 641 F.3d 786, 793 (7th Cir. 2011) (observing that cash buffers "allow[] participants to quickly sell their interests in the funds" without having to wait for the sale of stock, and "allow[] the [p]lan to save transaction costs by 'netting' participant transactions[,]" avoiding brokerage commissions being charged to the plan each time a request to buy or sell stock is made). Considering these benefits, courts have rejected claims alleging breach of fiduciary duties based on cash buffers contained in company stock funds. *See, e.g.*, *Taylor v. United Tech. Corp.*, No. 3:06cv1494(WWE), 2009 WL 535779, at *9-10 (D. Conn. Mar. 3, 2009) (holding that "retaining cash to provide transactional liquidity satisfies the prudent person standard"). Therefore, Plaintiffs' allegations regarding the DST Stock Fund's management does not suggest imprudence.

## E. Advisory Committee Qualifications

Finally, Plaintiffs assert that the Advisory Committee was unqualified to manage the Plan, failed to engage an investment adviser to manage the 401(k) portion of the Plan and failed to operate without formal guidelines. SAC ¶¶ 57-58, 67. These claims fail as well.

As an initial point, Plaintiffs' allegations concerning the Advisory Committee's knowledge and expertise, without additional facts, are too conclusory for the Court to accept as true. *See Morgan Stanley*, 712 F.3d at 717 (holding that to survive a motion to dismiss, a complaint must contain more than "labels and conclusions or a formulaic recitation of the elements of a cause of action") (quoting *Iqbal*, 556 U.S. at 678). The Court cannot assume defendants' ineptitude based solely on the alleged results of their decisions. Indeed, the SAC fails to allege who served on the Advisory Committee, when they served, or their qualifications. Thus, Plaintiffs' allegations do not allow the Court to reasonably infer that the Advisory Committee was incompetent at a surface level.

Furthermore, Plaintiffs' allegations that the Advisory Committee "failed to engage an investment advisor for the 401(k) portion of the Plan from 2010 through 2015" and failed to "obtain[] the advice of an investment consultant to assist" it are inadequate as well. SAC ¶¶ 57, 67. Nothing in ERISA requires a 401(k) retirement plan investment committee to engage an investment adviser. Moreover, the SAC acknowledges that BMO Harris Bank helped the Advisory Committee make investment option decisions. *Id.* ¶ 67. Plaintiffs assert that BMO's reports were "canned" *Id.* However, this is a factually unsupported and conclusory statement. Thus, this accusation is inadequate to support a claim.

Plaintiffs also assert that the Advisory Committee "operated without any formal guidelines or system" and did not adopt a charter to govern its conduct. *Id.* at ¶¶ 58, 67. Unlike the previous allegations, this is a statement of fact. However, it is also a fact that ERISA does not require a committee to adopt a charter or a specific governing system. Armed only with the facts in the SAC, it would be unreasonable for the Court to infer that the Advisory Committee did not have the requisite knowledge or procedures in place to prudently serve as fiduciaries.

**IV.    Analyzing the Allegations as a Whole**

As noted above, Plaintiffs do not assert that any of their allegations are sufficient to sustain a breach of fiduciary duty claim standing alone. Instead, they contend that they supplement each other as circumstantial facts and allow the Court to infer that the DST Defendants engaged in a flawed process while managing the 401(k) portion of the plan.

Plaintiffs correctly point out that the Court should "read [the complaint] as a whole." Pl.'s Opp. 23. However, Plaintiffs fail to show, through reasonable inferences from well-pleaded facts, that DST Defendants' managerial choices did not meet ERISA's requirements. Plaintiffs' circumstantial factual allegations can be summarized as the following: DST Defendants 1) offered certain investments that underperformed their benchmarks and failed to include cheaper investments options; 2) failed to consider competing bids; and, 3) failed to operate without outside assistance of formal guidelines. As explained above, Plaintiffs failed to provide additional sufficient factual allegations to support why a prudent investor in DST Defendants' shoes would have never arrived at these decisions. Indeed, Plaintiffs allegedly lost millions of dollars after these decisions were made. However, liability for this loss only attaches to the fiduciaries who made these decisions if a plaintiff proves that an adequate investigation would have prevented the fiduciaries from making them.

In sum, Plaintiffs failed to allege sufficient facts to suggest that a prudent fiduciary in like circumstances would have acted differently from DST Defendants. Therefore, Plaintiffs' breach of the fiduciary duty of prudence claim concerning the 401(k) portion of the Plan is dismissed.

## CONCLUSION

For the foregoing reasons, Defendants' Partial Motion to Dismiss is GRANTED. The Clerk of Court is respectfully directed to terminate the motion at docket entry number 86.

**SO ORDERED.**

**Dated**:    September 18, 2019
         New York, New York

_____

**ANDREW L. CARTER, JR.**
**United States District Judge**