## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| MICHAEL L. FERGUSON, | : | CIVIL ACTION NO. |
| MYRL C. JEFFCOAT and DEBORAH SMITH, | : | 1:17-cv-06685-ALC |
| Individually and as Representatives of a Class of | : | |
| Similarly Situated Plan Participants and | : | |
| Beneficiaries, and on behalf of the | : | |
| DST SYSTEMS, INC. 401(K) PROFIT | : | **THIRD AMENDED** |
| SHARING PLAN, | : | **CLASS ACTION COMPLAINT** |
| | : | |
| Plaintiffs, | : | |
| | : | JURY TRIAL DEMANDED |
| v. | : | |
| | : | |
| RUANE CUNNIFF & GOLDFARB INC.; | : | |
| DST SYSTEMS, INC.; THE ADVISORY | : | |
| COMMITTEE OF THE DST SYSTEMS, INC. | : | |
| 401(K) PROFIT SHARING PLAN and THE | : | |
| COMPENSATION COMMITTEE OF THE | : | |
| BOARD OF DIRECTORS OF DST SYSTEMS, | : | |
| INC., | : | |
| | : | |
| Defendants. | : | |
| | : | |

## I.  INTRODUCTION

1.      Plaintiffs, Michael L. Ferguson ("Ferguson"), Myrl C. Jeffcoat ("Jeffcoat") and

Deborah Smith ("Smith") (collectively, "Plaintiffs"), individually and as representatives of a

class of similarly situated plan participants and beneficiaries,[1] and on behalf of the DST Systems,

Inc. 401(k) Profit Sharing Plan (the "DST Plan" or the "Plan"), bring this action under 29 U.S.C.

§1132 against Defendants, Ruane, Cunniff & Goldfarb Inc.; DST Systems, Inc.; the Advisory

Committee of the DST Systems, Inc. 401(k) Profit Sharing Plan; and the Compensation

Committee of the Board of Directors of DST Systems, Inc. (collectively, "Defendants"), for

---

[1]The proposed class excludes any plan participant or beneficiary who has ever been a
member of the Advisory Committee of the DST Plan or the Compensation Committee of the
Board of Directors of DST Systems, Inc. or otherwise served as a fiduciary of the DST Plan
during the Class Period (defined below).

breach of fiduciary duties and other violations of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001, *et seq*. Plaintiffs' Third Amended Complaint ("Complaint") is filed pursuant to Fed.R.Civ.P. 15(a)(2).

2.      Defined contribution plans that are qualified as tax-deferred vehicles under Section 401 of the Internal Revenue Code ("IRC"), 26 U.S.C. §§ 401(a) and (k)(*i.e.,* 401(k) plans), have become the primary form of retirement savings in the United States and, as a result, America's *de facto* retirement system.  Unlike traditional defined benefit retirement plans, in which the employer typically promises a calculable benefit and assumes the risk with respect to high fees or under-performance of pension plan assets used to fund defined benefits, 401(k) plans operate in a manner in which participants bear the risk of high fees and investment under-performance.

3.      Personal savings accounts in the form of 401(k) and other defined contribution plans have become the primary method for employees in the United States to save for retirement in recent years.  The importance of defined contribution plans to the United States retirement system has become increasingly pronounced as employer-provided defined benefit ("DB") plans have become exceptionally rare as an offered and meaningful employee benefit.

4.      With more than $1 billion in assets, the Plan is in the top one percent (1%) of 401(k) plans in the country in terms of assets.[2]  The marketplace for 401(k) retirement plan

_____

[2] As explained below, the Plan historically was effectively composed of two elements: the Profit Sharing Account ("PSA"), a retirement vehicle more akin to a DB in many respects (in which DST made contributions on behalf of employees and delegated sole and exclusive responsibilities for investment management to Ruane), which pre-dated the creation of the elements of the Plan that are more typical of 401(k) plans (*i.e.*, containing a menu of mutual fund and similar investment options from which participants choose to invest and for which the Plan and its fiduciaries disclaim responsibility beyond creation and maintenance of the overall menu of investment options and certain other elements of the 401(k) plan, including the reasonableness of the Plan's fees and expenses) and, indeed, which pre-dated the legal existence of the 401(k) as an investment vehicle -- meaning that the PSA pre-dated the legal creation of 401(k) plans, which occurred with an amendment to the IRC in 1978.  Ruane was terminated as the investment

services is well established and can be competitive when fiduciaries of defined contribution retirement plans act in an informed and prudent fashion.  Billion dollar defined contribution plans, like the Plan, have significant bargaining power and the ability to demand low-cost administrative and investment management services within the marketplace for administration of 401(k) plans and the investment of 401(k) assets.  As fiduciaries to the Plan, Defendants are obligated to act for the exclusive benefit of participants, invest the assets of the Plan in a prudent fashion and ensure that Plan expenses are fair and reasonable.  At all pertinent times, as explained below, Defendants (a) were fiduciaries under ERISA, and (b) breached their fiduciary duties under ERISA in a myriad of significant ways, to the extreme detriment of the Plan and its participants.

5.      As explained more fully below, Defendants pursued an exceptionally imprudent investment strategy with respect to a significant portion of the Plan's assets (which they invested without any input or oversight by participants in the Plan) and/or failed to adequately monitor the investments of the Plan and the fiduciaries pursuing this investment "strategy."  As a direct result and consequence of these imprudent investment decisions and related misconduct, the Plan (and, as a result, its participants) has suffered losses well in excess of $100 million.

6.      To remedy these fiduciary breaches and other violations of ERISA, Plaintiffs

---

manager of the PSA in 2016 as a result of a number of extraordinary breaches of fiduciary duty by Ruane to the Plan relating to Ruane's investments in Valeant Pharmaceuticals International Inc., n/k/a Bausch Health Companies Inc. ("VRX" or "Valeant" or "Valeant Pharmaceuticals"), and the PSA was terminated as an investment vehicle available to Plan participants by DST Systems, Inc.; the Advisory Committee of the DST Systems, Inc. 401(k) Profit Sharing Plan; and the Compensation Committee of the Board of Directors of DST Systems, Inc. (collectively, the "DST Defendants") in 2016 with all of the PSA's assets transferred to investments in the Plan's more typical 401(k) -- i.e., participant directed -- components.  As explained below, at all pertinent times, the PSA was treated by the DST Defendants and Ruane as a unitary investment fund -- separate and apart from the 401(k) elements of the Plan, and without regard for or consideration of the investment components contained in the participant-directed portion of the Plan.

bring this action individually and as representatives of a class of similarly situated plan participants and beneficiaries, on behalf of the Plan under Section 502, 29 U.S.C. §1132, and Section 409 of ERISA, 29 U.S.C. §1109, to recover and obtain all losses suffered by the Plan and its participants resulting from each breach of fiduciary duty, prohibited transaction and other violation of ERISA; to restore to the Plan any profits made through Defendants' use of the Plan's assets; and for disgorgement with respect to all fees and compensation received by any of the Defendants in connection with any prohibited transaction.  In addition, Plaintiffs seek such other equitable or remedial relief for the Plan as the Court may deem appropriate and just under all of the circumstances.

7.      Plaintiffs specifically bring this action on behalf of the Plan under ERISA §§ 409 and 502, 29 U.S.C. §§ 1109 and 1132, to recover the following relief:

- A declaratory judgment holding that the acts of Defendants described herein violate ERISA and applicable law;

- A permanent injunction against Defendants prohibiting the practices described herein and affirmatively requiring them to act in the best interests of the Plan participants;

- Disgorgement and/or restitution of all payments and other compensation improperly received by Defendants, or, alternatively, the profits earned by Defendants in connection with their receipt of such unlawful payments and other unlawful compensation;

- Compensatory damages;

- Attorneys' fees, costs and other recoverable expenses of litigation; and

- Such other and additional legal or equitable relief that the Court deems appropriate and just under all of the circumstances.

## II.    THE PARTIES

8.      Plaintiff, Ferguson, is a participant under 29 U.S.C. §1002(7) of the DST Plan, which is a defined contribution, individual account, employee pension benefit plan under 29

U.S.C. §1002(2)(A) and §1002(34).  Ferguson is a resident of Buckner, Jackson County, Missouri.

9.       Plaintiff, Jeffcoat, is a participant under 29 U.S.C. §1002(7) of the DST Plan, which is a defined contribution, individual account, employee pension benefit plan under 29 U.S.C. §1002(2)(A) and §1002(34).  Jeffcoat is a resident of Rancho Cordova, Sacramento County, California.

10.      Plaintiff, Smith, is a participant under 29 U.S.C. §1002(7) of the DST Plan, which is a defined contribution, individual account, employee pension benefit plan under 29 U.S.C. §1002(2)(A) and §1002(34).  Smith is a resident of Glastonbury, Hartford County, Connecticut.

11.      The Plan is established and maintained under a written document in accordance with 29 U.S.C. §1102, and serves as a vehicle for retirement savings and to produce retirement income for employees of DST Systems, Inc. and certain of its subsidiaries and affiliates, including, but not limited to, ALPS Advisors, Inc.; ALPS Fund Services, Inc.; Argus Health Systems, Inc.; Converge Systems, LLC; DST Brokerage Solutions, LLC; DST Direct, LLC; DST Global Solutions NA, LLC; DST Health Solutions, LLC; DST Mailing Services, Inc.; DST Market Services, LLC; DST Output, LLC; DST Output Central, LLC; DST Output East, LLC; DST Output West, LLC; DST Output Electronic Solutions, Inc.; DST Systems of California, LLC; DST Realty, Inc.; DST Realty of California, Inc.; DST Retirement Solutions, LLC; DST Technologies, Inc.; DST Worldwide Services, LLC; Finix Professional Services, LLC; Lateral Group NA, LLC; LTM Publishing, Inc.; MC Realty Group, LLC; McKay Hochman Co., Inc.; National Financial Data Services, Inc. d/b/a BFDS Midwest; Newkirk Products, Inc.; and ThirdParty Educational Systems, Inc. (the "DST Affiliates").  DST Systems, Inc. ("DST Systems") is hereafter referred to individually and/or collectively with the DST Affiliates, as may be applicable, as "DST" or the "Company."  Retirement income generated by the Plan depends

upon contributions made on behalf of each employee by the Company, deferrals of employee compensation and employer matching contributions, and from the performance of investment options (net of fees and expenses) exclusively controlled by the fiduciaries of the Plan. DST established a trust (the "Trust") to hold participant and employer contributions and such other earnings, income and appreciation from Plan investments, less payments made by the Plan's trustee to carry out the purposes of the Trust, in accordance with 29 U.S.C. §1103. As of December 31, 2014, the Plan was one of the country's largest 401(k) plans, with more than $1.4 billion in total assets and over 9,400 participants with account balances. As of December 31, 2015, the Plan had over $1.3 billion in total assets and more than 9,500 participants with account balances. As of December 31, 2016, the Plan had over slightly over $1 billion in total assets (a decline in value of over $300 million from the year before) and more than 10,000 participants with account balances. As of December 31, 2016, over 20% of Plan participants were either retired from DST or otherwise not employed by DST. As of December 31, 2017, the Plan had over slightly over $1.4 billion in total assets and more than 10,000 participants with account balances. As of December 31, 2017, over 30% of Plan participants were either retired from DST or otherwise not employed by DST. As of December 31, 2018, the Plan had over $1.15 billion in total assets and more than 9,000 participants with account balances.

12.     Defendant, Ruane, Cunniff & Goldfarb Inc. ("RCG" or "Ruane"), is a Delaware corporation and registered investment adviser with its principal place of business in New York, New York. RCG is an investment firm that served as an investment adviser and fiduciary to the Plan pursuant to 29 U.S.C. § 1002 (and, more specifically, Section 3(38) of ERISA, 29 U.S.C. § 1002(38), until approximately August, 2016, when its services to the Plan were terminated. RCG's flagship fund, the Sequoia Fund, Inc. (the "Sequoia Fund"), contained more than $25 billion in assets until Ruane engaged in a misguided and reckless investment strategy (detailed

below) that was focused upon pursuing investments in Valeant Pharmaceuticals.

13.     Defendant, DST Systems, is a corporation organized and existing under the laws of the State of Delaware with its principal place of business in Kansas City, Jackson County, Missouri.  DST Systems is the Plan sponsor and Plan administrator, a designated fiduciary of the Plan, and a fiduciary under ERISA pursuant to 29 U.S.C. §§ 1002, 1102.   DST Systems is a subsidiary of SS&C Technologies Holdings, Inc., which maintains its headquarters in Windsor, Connecticut.

14.     Defendant, the Advisory Committee of the DST Systems, Inc. 401(k) Profit Sharing Plan (the "Advisory Committee" or the "Advisory Committee Defendants"), is a named fiduciary under the Plan and under ERISA pursuant to 29 U.S.C. §§ 1002, 1102. The Advisory Committee maintains its address at the headquarters of DST Systems in Kansas City, Jackson County, Missouri.

15.     Defendant, the Compensation Committee of the Board of Directors of DST Systems, Inc. ("Compensation Committee" or the "Compensation Committee Defendants"), has the sole authority to appoint and remove members of the Advisory Committee, amend or terminate, in whole or part, the Plan or the Trust, and is a named fiduciary under the Plan and under ERISA pursuant to 29 U.S.C. §§ 1002, 1102. The Compensation Committee maintains its address at the headquarters of DST Systems in Kansas City, Jackson County, Missouri.

16.     DST, the Advisory Committee Defendants and the Compensation Committee Defendants are referred to herein collectively as the "DST Defendants."

17.     DST has the ultimate discretionary authority or control regarding management of the Plan or management or disposition of the Plan's assets, and administered the Plan through the Compensation Committee and officers and employees of DST, including members of the Advisory Committee.

### III.   JURISDICTION AND VENUE

18.     Plaintiffs seek relief on behalf of the Plan pursuant to ERISA's civil enforcement remedies with respect to fiduciaries and other interested parties and, specifically, under ERISA Sections 409 and 502, 29 U.S.C. §§ 1109 and 1132.

19.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 and ERISA Section 502(e), 29 U.S.C. § 1132(e).

20.     Venue is proper in this judicial district pursuant to ERISA Section 502(e), 29 U.S.C. § 1132(e) and 28 U.S.C. § 1391, because RCG maintains its headquarters and principal place of business in New York, New York.  At all pertinent times, RCG has conducted its investment advisory business and provided services to the Plan from its offices in this judicial district in New York, New York, which offices function as the nerve center for the operations of RCG. At all pertinent times, the PSA (defined below) was administered in New York, New York, by RCG, which also provides additional investment advisory services to the Plan forming the substantial bases for this action from New York, New York.  In addition, the majority or a significant number of the acts and omissions giving rise to this action and the losses suffered by the Plan arose and were directed from this judicial district.

### IV.   BACKGROUND FACTS

**A.      The Composition Of The DST Plan**

21.     At all pertinent times, the DST Plan consisted of two components: a 401(k) portion, which is participant-directed, and a Profit Sharing Account ("PSA"), in which the assets were invested by the Trustee of the Plan, as advised by an investment advisory firm (*i.e.*, RCG) selected and monitored by the Advisory Committee; *i.e.*, the assets are not participant-directed. Until December 31, 2014, the DST Plan also included an investment option that permitted participants to invest in DST stock (the "Company Stock Fund").  The PSA was terminated in

2016 when the Plan terminated the services of RCG, at which time all of the investments in the Plan became participant-directed.

22.     This arrangement, in which the PSA was not participant-directed, is extremely unusual (since PSA assets almost always are participant directed), and resulted in the entire Plan or, at a minimum, that PSA portion of the Plan losing the protection of Section 404(c) of ERISA. Until the PSA was terminated in or about August, 2016, a significant percentage of participants in the Plan were invested only in the PSA and were not invested in the 401(k) portion of the Plan.

**B.**     **The PSA Portion Of The DST Plan**

23.     The PSA was structured by DST to provide a projected level of benefits through contributions by the Company invested in a manner that DST, the Advisory Committee Defendants and Ruane (as the investment adviser to the PSA) had supposedly determined would achieve a desirable, aggressive, long-term rate of return -- in essence, an investment strategy akin to that of a DB plan -- without the obligation for the Company to make any contributions in the event of an investment return short-fall or provide any guaranteed benefit. As detailed below, the assets of the PSA were invested in a reckless and imprudent manner by Ruane, to the severe detriment of the Plan (and thereby, its participants), which has suffered losses in excess of $100 million as a result of the breaches of duty detailed in this Complaint. In sum, with respect to the retirement savings of Plan participants, as detailed below, Ruane (under the oversight and with the consent of DST and the Advisory Committee Defendants) gambled with these Plan assets by failing to appropriately diversify the investment of the Plan's assets and pursuing risky, inappropriate investment strategies, while the Compensation Committee Defendants failed to fulfill their duties to supervise the Advisory Committee Defendants. In addition, the Plan participants were not provided with meaningful and timely guidance regarding the nature of the investments held in the PSA or any specific or meaningful and

9

timely information regarding the investment objectives or investment components of the PSA.

24.     With respect to the PSA portion of the Plan, RCG, the Company and the other Defendants specifically gambled (or permitted other Defendants to gamble) over one-third of the Plan's employee retirement assets in an opaque, high-cost, high-risk, long-term investment strategy.  While the Plan purports to be designed to obtain the protections of Section 404(c) of ERISA and, under Section 404(c), Plan fiduciaries may be relieved of liability for poor investment decisions made by Plan participants, at a minimum and at all pertinent times, the investments in the PSA did not qualify for Section 404(c) protection because Defendants directly or indirectly controlled these investments with absolutely no participant input or control.  Moreover, since DST and the Advisory Committee Defendants forcibly allocated (and the Compensation Committee Defendants permitted the forceable allocation of) approximately one-third of the Plan's assets into an opaque, high-cost, high-risk investment vehicle (*i.e.,* the PSA) that functioned as unitary investment fund (since many Plan participants were only invested in the PSA), which Ruane mismanaged in its sole discretion in a shockingly reckless manner, the Plan's entire investment menu was tainted, and none of the investments in the Plan qualify for Section 404(c) protection because these Defendants effectively eliminated the opportunity for participants to diversify their retirement savings and investments at all times that RCG managed the PSA, and the Plan contained significant assets that were not participant directed.  As detailed further below, at all pertinent times, Ruane managed and controlled the investments contained in the PSA in an unfettered and effectively unsupervised manner and pursued an investment strategy with respect to the PSA that was exceptionally reckless and imprudent, and demonstrated an absence of knowledge, appreciation or expertise as to how retirement funds should be managed and invested.

25.     Participants in the Plan were prevented from receiving meaningful information

regarding the investment objectives of the PSA. Participants did not receive regular updates or meaningful information regarding the investment objectives of or the securities or other investments contained in the PSA.  Instead, participants in the Plan simply received periodic, post-hoc reports regarding the performance of the PSA that provided generalized information regarding the return (or lack thereof) achieved in connection with the investment of the PSA. Although Plan participants were permitted to obtain additional information regarding the retrospective performance of the PSA of a limited nature in more recent years, Plan participants literally had no means to monitor the current investments contained in the PSA in order to otherwise diversify their retirement investments based upon the current and existing investments in the PSA -- about which participants literally received no meaningful disclosure or information.

26.     The limited information provided to Plan participants regarding the investment objectives of the PSA bordered on the absurd.  Specifically, the information provided regarding the PSA's investment objectives simply stated that the PSA had an investment objective "to achieve positive growth over the long term."  That generic description of the PSA's investment objective (which presumably applies to all investment funds, including retirement investment funds), provided absolutely no guidance or insight regarding the investment strategy or investment components of the PSA.  Moreover, there were no asset class limitations or other restrictions or guidelines imposed with respect to the investments contained in the PSA, and none of the information provided to Plan participants contained a meaningful description of the investment objectives of the PSA or the existence (or lack thereof) of any asset class limitations or other investment restrictions or guidelines.  Instead, participants were provided with the essentially meaningless information that the PSA sought to achieve positive growth over the long term, which characterizes virtually every retirement investment of any kind.  Ironically,

with respect to the non-PSA portion of the Plan (discussed below), Defendants consistently advised participants that they should not invest in any of the investments chosen by the Advisory Committee as available investments (*i.e.*, the mutual funds discussed below) without first carefully reading the prospectus associated with the investment.  But, in the case of the PSA, in which over one-third of the Plan's assets were invested, there was no ability on the part of Plan participants to obtain timely or meaningful information.  Thus, at all pertinent times, participants were effectively prevented from obtaining any information regarding the current investments or holdings of the PSA.

27.    Even if Defendants had fully disclosed to Plan participants the investment objectives, strategies and portfolio holdings of the PSA (which, as discussed above and below, they did not), participants could not properly diversify their retirement investments by simply eliminating risks related to the PSA by diversifying the other two-thirds of their retirement assets.  That is because the PSA constituted such a significant portion of the Plan's investments and assets that participants did not have a meaningful opportunity or means to properly diversify their retirement investments in the Plan, given the dominance of the PSA within the Plan.  As detailed below, the Trustee of the Plan specifically advised participants to avoid over-concentration by investing retirement assets in one industry or security with more than 20% of their retirement assets contained in the non-PSA portion of the Plan (discussed below).  Amazingly, as discussed below, Defendants and RCG utterly failed to heed this same advice and, as a result, lost over $100 million in Plan assets by failing to adequately diversify the PSA.

28.    At all pertinent times, there was absolutely no transparency with respect to the investments in the PSA or the risk level that the Advisory Committee authorized RCG to pursue in connection with the investments in the PSA.  When participants inquired as to the investment strategy of the PSA and/or the nature of the investments held in the PSA, the Company

responded that participants should not worry because "the Company invests this for you."  At times, certain participants in the Plan were told that the PSA was operated by Ruane effectively as a clone of its flagship Sequoia Fund -- but any such information also was untrue because, as detailed below, Ruane shockingly engaged in a more risky investment strategy with respect to the PSA (designed solely for retirees) than the Sequoia Fund itself (designed for high net worth individuals and other sophisticated investors).

**C.**     **RCG's Investment Management Of The PSA**
          **And The Relationship Between RCG And DST**

29.     DST has a significant financial services/investment advisory business itself -- with the Company's financial services/investment advisory business contributing almost 50% of the Company's revenues.  It appears that many of the investment managers retained by DST to manage 401(k) assets have business relationships with DST.  Moreover, the sole investment manager selected by the Advisory Committee to manage the PSA, RCG, has had a relationship with the Company that "goes back decades-to the 1980s."

30.     The Plan's Summary Plan Description ("SPD") advised participants that "[a]ll Profit Sharing Contributions made by the Employer to the Plan on your behalf will be invested by the Trustee as advised by Ruane, Cunniff & Goldfarb, Inc., the investment adviser selected by the Advisory Committee to manage these funds" and "[y]ou may not direct the investment of these funds into other investment alternatives."

31.     RCG is an investment advisory firm which has managed the historically successful Sequoia Fund for decades.  RCG and Berkshire Hathaway's Warren Buffett had a longstanding personal relationship -- Buffett referred clients to RCG's Sequoia Fund when he closed his investment partnership in 1969 and the mutual fund, since first buying Berkshire Hathaway stock about 20 years ago, has made it a major holding.

13

32.     At one point, Berkshire Hathaway holdings accounted for nearly 40% of the Sequoia Fund portfolio.  Indeed, it appears that the Sequoia Fund's historical returns were due, in part, to its Berkshire Hathaway holdings and, once the fund began reducing Berkshire Hathaway holdings, it has underperformed the S&P 500.  Berkshire Hathaway Class A is the second largest holding in the Sequoia Fund and Berkshire Hathaway Class B is the Sequoia Fund's fifth largest holding, for a total of 11% of assets under management.

33.     Critics have observed that two of the founders of RCG are no longer living; performance has suffered in recent years and the reputation the firm has enjoyed for so many years is no longer deserved.  These are all factors which the Advisory Committee should have considered in deciding whether to continue to retain the firm as the Company's PSA investment manager.

34.     DST serves as the registrar and shareholder servicing agent for the Sequoia Fund. DST provides investor recordkeeping, performance communications and other information to shareholders of the Sequoia Fund and has other administrative responsibilities with respect to the Sequoia Fund.  Ironically, while the Sequoia Fund is fully transparent to investors due, in part, to DST handling shareholder communications, the PSA (which was supposed to "mirror" the Sequoia Fund in a separate account, even though the status of the PSA as a supposed "clone fund" of the Sequoia Fund was never disclosed to Plan participants) was highly opaque.  Since the Sequoia Fund was designed as an investment vehicle for high net worth individuals with ample funds to gamble and lose, RCG's decision to purportedly mimic the investments of the Sequoia Fund in the PSA was reckless and imprudent because Ruane gave absolutely no consideration to the fact that the PSA contained retirement funds and, therefore, the investment objectives of the PSA necessarily should be tailored to recognize that plain fact.  As explained below, RCG did not, in fact, operate the PSA as a clone of the Sequoia Fund and, instead,

14

actually took greater risks with the retirement assets in the PSA than the assets of high net worth investors in the Sequoia Fund.  Likewise, DST and the Advisory Committee Defendants breached their fiduciary duties by failing to adequately supervise RCG and insist upon an appropriate investment strategy for the PSA, while the Compensation Committee failed to fulfill its duties to supervise these Defendants.

35.     DST and the Advisory Committee, as ERISA fiduciaries, have failed to provide participants with meaningful and timely information about the PSA, which they regularly received from Ruane and could have provided to Plan participants.  Ironically, this is exactly the kind of information that DST receives and routinely provides to Sequoia Fund shareholders as the shareholder servicing agent of the mutual fund.  Given the longstanding financial relationship between the Company and the Sequoia Fund, the selection of RCG to manage the PSA raises significant self-dealing concerns under ERISA.  Both the Company and RCG are ERISA fiduciaries and, as such, each is prohibited from using the Plan's assets in its own interests.  Here, however, the Sequoia Fund paid compensation to DST and the Plan paid compensation to the Sequoia Fund's manager, RCG, to support the Sequoia Fund's investment strategies.

36.     Even if the initial selection of RCG by the Advisory Committee were somehow prudent (and putting aside *arguendo* questions of self-dealing), it bears noting that RCG has experienced significant management changes in recent years, as well as reduced its longstanding and significant reliance upon Berkshire Hathaway stock amid faltering performance, factors which the Advisory Committee apparently failed to monitor consistent with its fiduciary duties to the Plan.

37.     During its time as the investment adviser to the PSA, RCG charged the Plan a 1% "flat" fee to manage the PSA.  The 1% flat fee paid to RCG to separately manage the PSA was grossly excessive at all pertinent times.  That fee is the same fee that RCG charges retail

investors in the Sequoia Fund.  Flat fees for traditional asset management mandates are exceptionally rare.  DST's $750 million institutional account easily could have negotiated a much lower fee -- with breakpoints -- than that offered to retail investors in the Sequoia Fund. Defendants should have ensured that the asset management fee paid to Ruane was significantly less than the 1% flat fee paid by the Plan.  Indeed, RCG's Form ADV Part II indicates that, for managed accounts, the Adviser "typically" charges a 1% fee, but that "fees may be negotiable under certain circumstances or for certain managed account clients."  Here, the failure by the Advisory Committee to negotiate a lower investment management fee payable to RCG (and the Compensation Committee's apparent failure to monitor or evaluate the Advisory Committee's acts and omissions) during the Class Period (discussed below) reflects an abject failure on the part of these fiduciaries in terms of procedural and substantive prudence and a blatant breach of fiduciary duty.  If the Advisory Committee had obtained any competent advice or engaged in any due diligence with respect to the fees being paid to RCG, or if the Compensation Committee had monitored the Advisory Committee to ensure that it was receiving competent and unbiased advice, it would have immediately discovered that the fees being paid to RCG were grossly excessive under all of the circumstances and that millions of dollars in excessive fees were being paid to RCG by the Plan.

38.     Between 2010 and 2016, RCG was paid over $35 million in investment management fees by the Plan with over $25 million of such fees paid directly by Plan participants.  In light of Ruane's misconduct and severe breaches of fiduciary duty, in addition to all other available relief, Ruane should be required to disgorge all investment management fees it received from the Plan and its participants under applicable law.

39.     The Advisory Committee also apparently failed to police or object to RCG's dubious practice of engaging in self-dealing with respect to substantially all securities

transactions. RCG's Form ADV Part II states that Ruane and one of its supervised persons receive compensation in connection with the purchase and sale of substantially all securities through RCG's affiliated broker-dealer. Even if allegedly undertaken in compliance with an applicable ERISA exemption, it was objectively unreasonable for the Advisory Committee to permit such self-dealing as a fiduciary solely focused upon the best interests of the Plan. There is absolutely no benefit to the Plan from permitting this self-dealing arrangement involving substantially all of the PSA's trading activity, which only benefits RCG and effectively results in the Plan paying RCG even more excessive and unreasonable compensation. Under the circumstances, Ruane likewise should be required to disgorge all compensation that it earned from securities lending utilizing the assets of the Plan.

40.     As participants in the Plan belatedly learned, RCG shockingly invested an enormous and imprudent amount of the PSA in the stock of Valeant Pharmaceuticals.

41.     In or about April, 2010, Ruane began purchasing shares of Valeant on behalf of the PSA. By December 31, 2010, Ruane had purchased a total of approximately 1,572,207 shares of Valeant on behalf of the PSA. By March 31, 2011, the value of Valeant stock in the PSA had grown to 15% of the total value of the PSA and was the single largest investment held by the PSA. By no later than March 31, 2011, if not earlier, all Defendants should have been carefully monitoring the investments in Valeant based upon these high concentration levels, but no such monitoring or evaluation of the investments in VRX ever occurred until 2015, when Valeant stock accounted for an enormous percentage of the PSA's assets. According to the Plan's financial statements at year-end 2014, the PSA held approximately $225 million of VRX in non-participant directed assets, or almost 30% of its assets in 1,572,207 shares of Valeant, with a cost of $38.2 million. According to published reports, as of June 2015, the Sequoia Fund held approximately 35% of its assets in Valeant. Indeed, at times, VRX accounted for almost

50% of the value of the PSA.

42.     A number of participants in the Plan (almost 20%) maintained 100% of their retirement investments in the PSA, with no investments in the 401(k) portion of the Plan. Neither Ruane nor any of the other Defendants ever took any action to examine the investments in the 401(k) portion of the Plan for purposes of examining the Plan as a whole, including the PSA investments, for diversification purposes.  Instead, at all pertinent times, the PSA was treated as a unitary investment fund by Ruane and the remaining Defendants.

43.     RCG, as an investment adviser to the Plan, was an ERISA fiduciary.  RCG's investment of more than 30% percent (and, at times, almost 50%) of the PSA's assets in Valeant stock constituted a significant and shocking breach of fiduciary duty, since RCG failed to adequately diversify its investments in the PSA and otherwise breached its fiduciary duties by concentrating the PSA in one high-risk investment.

44.     The 52-week high of Valeant stock placed the PSA's interest in VRX at an approximate value of $414.7 million while, as of March 4, 2016, the PSA's interest in VRX had declined to as low as $61.31 per share, representing a total value of under $97 million -- a shocking loss in value of more than $300 million of the PSA's value from its approximate high. The investment of such a significant portion of the PSA's portfolio value in one security was highly imprudent and an abject breach of fiduciary duty.

45.     In as early as 2012, published news reports questioned Valeant's business model and accounting practices and, in 2013 and 2014, published news reports recounted that short sellers were targeting VRX in light of its financial reporting practices and significant uncertainty regarding the viability of its business model.  Such reporting continued into 2015 with well-regarded investors, including Charlie Munger, Berkshire Hathaway's Vice Chairman, challenging the prudence of investing in Valeant.  Indeed, in 2015, Ruane was placed on specific

notice that Valeant could not be trusted to report honestly regarding its business practices. Moreover, in 2015, two of the Sequoia Fund's Independent Directors resigned based on concerns related to Ruane's investments in VRX. Despite all of these signs that the PSA's investments in Valeant should be substantially limited, Ruane failed and refused to take any action to protect the Plan's participants.

46.    Amazingly, despite contrary representations by Ruane, the PSA was not, in fact, operated as a clone account of the Sequoia Fund and, in fact, held significantly higher concentrations of Valeant stock than the Sequoia Fund, a mutual fund that was marketed to high net-worth individuals and that, as a result of restrictions under the Investment Company Act of 1940 ("40 Act"), 15 U.S.C. §§ 80a-1–80a-64, was effectively prevented from holding over 25% of its investments in any one security. Thus, given the fact that the PSA was an ERISA-qualified fund, the breaches of duty by Ruane and the DST Defendants -- in permitting greater concentration in a qualified retirement plan than in a non-diversified mutual fund that existed for the investments of high-net worth individuals -- is particularly egregious and shocks the conscience.

47.    The Advisory Committee began belatedly monitoring Ruane's investments in Valeant in 2015 at a time when the holdings of VRX began to approach 50% of the value of the PSA, but failed to require Ruane to take any effective actions to reduce the enormous concentration of the PSA's assets in VRX. Although the Advisory Committee took belated and limited actions to suggest that Ruane reduce the holdings in Valeant in 2015, Ruane effectively ignored these requests and only sold less than 1% of the PSA's holdings in VRX in September, 2015, at a time when it could have sold significant shares of VRX and largely mitigated the losses suffered by the PSA.

48.    Making matters even worse, it is highly unlikely that RCG, as the PSA investment

manager, could sell its sizable Valeant holdings at the quoted price. That is because the PSA and RCG, in its role as the manager of the Sequoia Fund, was such an active participant in VRX, holding over 10% of Valeant stock in the Sequoia Fund alone -- not to mention RCG's other indirect holdings of VRX through separate accounts, such as the PSA.  As a result of these holdings, Ruane operated in a conflicted position in which it had no effective means to reduce its sizeable holdings in Valeant without signaling to the market that it had lost confidence in the value of VRX -- a decision that any reasonable fiduciary acting in an unconflicted capacity would have taken without hesitation -- even if only to limit the concentration levels in VRX within the PSA to a prudent and reasonable level.

49.     Approximately one-third of all Plan assets were held in the PSA.  Participants who were dependent upon these assets for their retirement security had no effective choice available to them but to endure the Valeant stock roller-coaster ride that RCG placed them upon and the Advisory Committee and the other Defendants enabled by selecting, retaining and remaining with RCG, despite obvious and compelling reasons to replace RCG.

50.     The Advisory Committee remained with RCG until the summer of 2016 as a result of a significant failure in terms of procedural and substantive prudence, as well as due, in part, to a longstanding, symbiotic relationship between the Company and the PSA investment manager, RCG.  Specifically, RCG was terminated as the PSA's investment manager on July 31, 2016, upon which date the PSA's investments in VRX had been liquidated -- as had the losses suffered by the Plan as a result of the investments in VRX and Defendants' other challenged conduct. An earlier termination of RCG, a battered investment manager that has been mired in litigation and has been plagued with redemptions, dismal performance and director resignations in the face of poor investment performance and the VRX investment debacle, from its role as the Plan's investment adviser would have been disastrous to RCG but obviously was in the

20

compelling interest of the Plan.

51.     The Advisory Committee and other Defendants, by explicitly and implicitly supporting RCG in the face of the apparent breaches of fiduciary duty by RCG and its extreme departures from sound investment strategies with respect to the retirement assets contained in the PSA, as well as by failing to pursue action against RCG, only can be rationally viewed as a misguided and unreasonable decision to support RCG in the face of compelling evidence that RCG had breached its fiduciary duties as an investment adviser to the Plan. By failing to act to promptly remove RCG and remedy its breaches of fiduciary duty, Defendants and the PSA effectively supported and propped up RCG at a time critical to RCG, to the benefit of RCG and the detriment of the Plan and its participants.

52.     Perversely, the PSA assets, which participants could not redeem, were used to support the price of the Valeant stock in the Sequoia Fund, an open-end mutual fund from which investors could redeem their shares at any time.

53.     At all pertinent times, RCG, as the investment adviser to the PSA, was responsible for prudently investing the assets of the PSA in the sole interest of the Plan participants.  RCG breached its fiduciary duties by recklessly and imprudently investing the assets of the PSA in its own interest.

54.     At all pertinent times, DST and the Advisory Committee were legally responsible for monitoring the investments undertaken by RCG in the PSA, and the Compensation Committee was legally responsible for monitoring the activities of the Advisory Committee with respect to the PSA.  In light of the shocking breaches of fiduciary duty by RCG when investing the PSA assets, and failing to properly diversify those investments, it is apparent that DST, the Advisory Committee and the Compensation Committee all breached their fiduciary duties with respect to monitoring the investment activities in the PSA and the oversight of RCG.

## V.  ERISA'S FIDUCIARY STANDARDS

55.     ERISA imposes strict fiduciary duties of loyalty and prudence upon the

Defendants as fiduciaries of the Plan. 29 U.S.C. §1104(a), states, in relevant part, as follows:

> [A] fiduciary shall discharge his duties with respect to a plan solely
> in the interest of the participants and beneficiaries and -
>
> (A)     for the exclusive purpose of
>
>> 1.     providing benefits to participants and their beneficiaries;
>> and
>> (ii)    defraying reasonable expenses of administering the plan;
>
>                          [and]
>
> (B)     with the care, skill, prudence, and diligence under the circumstances
>        then prevailing that a prudent man acting in a like capacity and
>        familiar with such matters would use in the conduct of an enterprise
>        of like character and with like aims.

56.     Under 29 U.S.C. 1103(c)(l), with certain exceptions not relevant here, the assets

of a plan shall never inure to the benefit of any employer and shall be held for the exclusive

purposes of providing benefits to participants in the plan and their beneficiaries and defraying

reasonable expenses of administering the plan.

57.     Under ERISA, fiduciaries that exercise any authority or control over plan assets,

including the selection of plan investments and service providers, must act prudently and solely

in the interest of participants in a plan.

58.     ERISA's fiduciary duties are "the highest known to the law" and must be

performed "with an eye single" to the interests of participants.

59.     ERISA also imposes explicit co-fiduciary liabilities on plan fiduciaries. 29

U.S.C. §1105(a) provides a cause of action against a fiduciary for knowingly participating in a

breach by another fiduciary and knowingly failing to cure any breach of duty. ERISA states, in

relevant part, as follows:

In addition to any liability which he may have under any other provision of this part, a fiduciary with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan in the following circumstances:

    (1)    if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach; or

    (2)    if, by his failure to comply with section 404(a)(l) in the administration of his specific responsibilities which give risk to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or

    (3)    if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

60.    29 U.S.C. §1132(a)(2) authorizes a plan participant to bring a civil action to enforce a breaching fiduciary's liability to the plan under 29 U.S.C. §1109.  Section 1109(a) provides, in relevant part:

Any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary.

## VI.  CLASS ACTION ALLEGATIONS

61.    29 U.S.C. §1132(a)(2) authorizes any participant or beneficiary of the Plan to bring an action individually, on behalf of the Plan, to enforce a breaching fiduciary's liability to the Plan under 29 U.S.C. § 1109(a).

62.    In acting in this representative capacity and to enhance the due process protections of unnamed participants and beneficiaries of the Plan, as an alternative to other procedural protections they may employ if the proposed class is not certified for any reason, Plaintiffs seek to certify this action as a class action on behalf of a class of similarly situated plan

participants and beneficiaries of the Plan.  Plaintiffs seek to certify, and to be appointed as representatives of, the following class (the "Class"):

> All participants and beneficiaries of the DST Systems, Inc. 401(k) Profit Sharing Plan from March 14, 2010 through July 31, 2016 (the "Class Period"), excluding the Defendants and all other individuals who are or have ever been a member of the Advisory Committee of the DST Plan, the Compensation Committee of the Board of Directors of DST or otherwise served as fiduciaries of the DST Plan during the Class Period.

63.     The action meets the requirements of Rule 23 and should be certified as a class action for the following reasons:

a. The Class includes more than 9,000 members and is so large that joinder of all its members is impracticable;

b. There are questions of law and fact common to the Class because the Defendants owed fiduciary duties to the Plan and all participants and beneficiaries, yet took the actions and omissions alleged herein as to the Plan and not as to any individual participant. Thus, common questions of law and fact including the following, without limitation: to whom are the fiduciaries liable for the remedies provided by 29 U.S.C. §1109(a); whether the fiduciaries of the Plan breached their fiduciary duties to the Plan; what are the losses to the Plan resulting from each breach of fiduciary duty; and what Plan-wide equitable and other relief the Court should impose in light of Defendants' breaches of duty;

c. Plaintiffs' claims are typical of the Class because Plaintiffs were participants during the time period at issue in this action, and all participants in the Plan were harmed by Defendants' misconduct;

d. Plaintiffs are adequate representatives of the Class because they were

participants in the Plan during the Class period, have no interest that is in conflict with the Class, are committed to the vigorous representation of the Class, and have engaged experienced and competent attorneys to represent the Class; and

e.  Prosecution of separate actions for these breaches of fiduciary duties by individual participants and beneficiaries would create the risk of: (A) inconsistent or varying adjudications that would establish incompatible standards of conduct for Defendants with respect to the discharge of their fiduciary duties to the Plan and personal liability to the Plan under 29 U.S.C. §1109(a); and (B) adjudications by individual participants and beneficiaries regarding these breaches of fiduciary duties and remedies for the Plan would, as a practical matter, be dispositive of the interests of the participants and beneficiaries not parties to the adjudication or would substantially impair or impede those participants' and beneficiaries' ability to protect their interests.

Therefore, this action should be certified as a class action under Rules 23(a) and 23(b)(1).

64.     Plaintiffs' counsel will fairly and adequately represent the interests of the Class and are best able to represent the interests of the Class under Rule 23(g) of the Federal Rules of Civil Procedure.

## COUNT I
### (For Breach Of Fiduciary Duty And Violation Of ERISA's Prohibited Transaction Rules)

65.     Plaintiffs incorporate the allegations in the previous paragraphs of this Complaint as if fully set forth herein.

66.     Defendants are fiduciaries of the Plan under ERISA, as explained above, and are

fiduciaries based on the discretion, authority and/or control with respect to the administration, management and/or disposition of the Plan and its assets, and/or provision of investment advice for a fee or other compensation with respect to the monies or other property of the Plan and Defendants' authority and responsibility with respect to the administration and management of the Plan and its retirement assets.

67.     Defendants control the selection of the mutual funds available as investment options for the Plan and its participants, provide investment advice for compensation with respect to these investment options, and/or use their discretionary authority and responsibility in the administration of the Plan to earn other compensation from self-dealing, as described above.

68.     Defendants are prohibited from receiving benefits in connection with their positions as fiduciaries of the Plan. At all pertinent times, Defendants have violated their fiduciary duties of prudence, loyalty and/or of monitoring under ERISA, as set forth herein.

69.     As detailed above, Defendants have engaged in and continue to engage in severe breaches of fiduciary duty with respect to the investments in the PSA and non-PSA portions of the Plan, in violation of ERISA § 404, 29 U.S.C. § 1104, by failing to (a) discharge their duties with respect to the Plan solely in the interest of the participants and beneficiaries for the exclusive purpose of providing benefits to participants and their beneficiaries, and defraying reasonable expenses of administering the Plan with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims, (b) diversify the investments of the Plan so as to minimize the risk of large losses, and (c) monitor the performance of other fiduciaries to the Plan in a prudent and reasonable manner.

70.     As detailed above, certain of the Defendants also have engaged in and continue to engage in prohibited transactions in violation of ERISA § 406(b)(1), 29 U.S.C. § 1106(b)(1), by

dealing with the assets of the Plan in their own interest or for their own account.

71.     As detailed above, certain of the Defendants also have engaged in and continue to engage in prohibited transactions in violation of ERISA § 406(b)(2), 29 U.S.C. § 1106(b)(2), by acting on behalf of third parties which have interests that are adverse to those interests of the Plan, its participants and/or beneficiaries in connection with transactions involving the Plan.

72.     As detailed above, certain of the Defendants have engaged in and continue to engage in prohibited transactions, in violation of ERISA § 406(b)(3), 29 U.S.C. § 1106(b)(3), by receiving consideration for their own personal accounts from parties such as mutual funds that are dealing with the Plan in connection with transactions (*i.e.*, the purchase and sale of mutual fund shares) involving the assets of the Plan.

73.     The Advisory Committee and the Compensation Committee, respectively, have breached their fiduciary duties to the Plan by failing to adequately and prudently monitor the performance of other fiduciaries of the Plan in the performance of their duties.

74.     Pursuant to ERISA §§ 409 and 502, 29 U.S.C. §§ 1109 and 1132, Defendants are liable to the Plan to credit back, disgorge and/or make restitution of all improper compensation received by them and are liable to the Plan to pay damages or make restitution to the Plan with respect to the losses suffered by the Plan.

75.     Plaintiffs, on behalf of the Plan, are entitled to all equitable or remedial relief as the Court may deem appropriate and just.

76.     Pursuant to ERISA § 502, 29 U.S.C. § 1132, Plaintiffs seek an Order declaring that the above-described practices of Defendants violate ERISA, as set forth above, and seek a permanent injunction preventing Defendants from engaging in such conduct in the future.

## COUNT II
### (For Breach Of Fiduciary Duty)

77.     Plaintiffs incorporate the allegations in the previous paragraphs of this Complaint as if fully set forth herein.

78.     Defendants' conduct, as set forth above, violates their fiduciary duties under ERISA § 404(a)(1)(A) and (B), 29 U.S.C. § 1104(a)(1)(A),(B) and (C), in that Defendants failed and continue to fail to discharge their duties with respect to the Plan solely in the interest of the Plan's participants and beneficiaries and (a) for the exclusive purpose of (i) providing benefits to participants and their beneficiaries; and (ii) defraying reasonable expenses of administering the Plan with (b) the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims, and/or (c) by failing to diversify the investments of the Plan so as to minimize the risk of large losses. In addition, as set forth above, the Advisory Committee and the Compensation Committee violated their respective fiduciary duties under ERISA to monitor other fiduciaries of the Plan in the performance of their duties.

79.     As a direct result of Defendants' breaches of duties, the Plan has suffered losses and damages.

80.     Pursuant to ERISA § 409, 29 U.S.C. § 1109, and ERISA § 502, Defendants are liable to restore to the Plan the losses that have been suffered as a direct result of Defendants' breaches of fiduciary duty and are liable for damages and any other available equitable or remedial relief, including prospective injunctive and declaratory relief, and attorneys' fees, costs and other recoverable expenses of litigation.

## COUNT III
### (For Co-Fiduciary Breach And Liability For Knowing Breach Of Trust)

81.     Plaintiffs incorporate the allegations in the previous paragraphs of this Complaint

as if fully set forth herein.

82.     In the alternative, to the extent that any of the Defendants are not deemed a fiduciary or co-fiduciary under ERISA, each such Defendant is liable to the Plan for all recoverable damages and relief as a non-fiduciary that knowingly participated in a breach of trust.

WHEREFORE, Plaintiffs, on behalf of themselves, the Class, and the Plan, demand judgment against Defendants, for the following relief:

(a)     Declaratory and injunctive relief pursuant to ERISA § 502, 29 U.S.C. § 1132, as detailed above;

(b)     Determination that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

(c)     Disgorgement, restitution and/or damages as set forth above, plus all other equitable or remedial relief as the Court may deem appropriate pursuant to ERISA §§ 409 and 502, 29 U.S.C. §§ 1109 and 1132;

(d)     Pre-judgment and post-judgment interest at the maximum permissible rates, whether at law or in equity;

(e)     Attorneys' fees, costs and other recoverable expenses of litigation; and

(f)     Such further and additional relief to which Plaintiffs and the Plan may be justly entitled and the Court deems appropriate and just under all of the circumstances.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand trial by jury as to all claims so triable.

## NOTICE PURSUANT TO ERISA § 502(h)

To ensure compliance with the requirements of ERISA § 502(h), 29 U.S.C. § 1132(h), the undersigned hereby affirms that, on this date, a true and correct copy of this Third Amended

Complaint was served upon the Secretary of Labor and the Secretary of the Treasury by certified mail, return receipt requested.

Dated: January 24, 2022              Respectfully submitted,

MILLER SHAH LLP

/s/ Laurie Rubinow (LR 6637)
James E. Miller
Laurie Rubinow
65 Main Street
Chester, CT 06412
Telephone: (866) 540-5505
Facsimile: (866) 300-7367
Email: jemiller@millershah.com
       lrubinow@millershah.com

Heidi A. Wendel
MILLER SHAH LLP
52 Duane Street, 7th Floor
New York, NY 10007
Telephone: (866) 540-5505
Facsimile: (866) 300-7367
Email: hawendel@millershah.com

Nathan C. Zipperian
MILLER SHAH LLP
1625 N. Commerce Parkway, Suite 320
Fort Lauderdale, FL 33326
Telephone: (866) 540-5505
Facsimile: (866) 300-7367
Email: nczipperian@millershah.com

Ronald S. Kravitz
Kolin C. Tang
MILLER SHAH LLP
201 Filbert Street, Suite 201
San Francisco, CA 94111
Telephone: (866) 540-5505
Facsimile:  (866) 300-7367
Email: rskravitz@millershah.com
       kctang@millershah.com

James C. Shah
Alec J. Berin
MILLER SHAH LLP
1845 Walnut Street, Suite 806
Philadelphia, PA 19103
Telephone: (866) 540-5505
Facsimile: (866) 300-7367
Email: jcshah@millershah.com
       ajberin@millershah.com

Chiharu G. Sekino
MILLER SHAH LLP
1230 Columbia Street, Suite 1140
San Diego, CA 92101
Telephone: (866) 540-5505
Facsimile: (866) 300-7367
Email: cgsekino@millershah.com

Monique Olivier
OLIVIER SCHREIBER & CHAO LLP
201 Filbert Street, Suite 201
San Francisco, CA 94133
Telephone: (415) 484-0980
Email: monique@osclegal.com

*Attorneys for Plaintiffs, the Plan
and the Proposed Class*